[S.F. No. 24727. Dec. 20, 1984.]

GARY A. MITCHELL et al., Petitioners, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
SHELL OIL COMPANY et al., Real Parties in Interest.

592

594

**COUNSEL**

Stemple & Boyajian, Michael A. Kramer, Gerald H. B. Kane, Jr., and Richard F. Gerry for Petitioners.

Leonard Sacks, Jean Corey, Al Schallau, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, Victoria De Goff, Douglas K. deVries, Sanford M. Gage, Ian Herzog, G. Dana Hobart, Stanley K. Jacobs, Harvey R. Levine, John C. McCarthy, Timothy W. Peach, Robert H. Sulnick, Arne Werchick and Stephen I. Zetterberg as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Sedgwick, Detert, Moran & Arnold, Stephen W. Jones, Berridge R. Marsh, Marie Sovey Silveira, Hardin, Cook, Loper, Engel & Bergez, Gennaro A. Filice III, Matthew S. Conant, O'Connor, Cohn, Dillon & Barr, Mark Oium, Glenn A. Friedman, Landels, Ripley & Diamond, James A. Bruen, Stephen C. Lewis and Deborah J. Schmall for Real Parties in Interest.

**OPINION**

**BROUSSARD, J.**—Petitioners, plaintiffs below, seek a writ of mandate ordering respondent superior court to vacate its order compelling plaintiff Bette Gae Mitchell to answer certain questions propounded to her by defendant real parties in interest at her deposition, which she declined to answer on instructions of counsel. The principal issues presented by this case

are whether defendants' questions seek information protected by the attorney-client privilege and, if so, whether plaintiff has waived that privilege in pursuing the present action. For reasons outlined herein, we will conclude that the information sought by defendants is covered by the attorney-client privilege and that no waiver thereof has occurred.

### STATEMENT OF FACTS

The relevant facts of the case were accurately set forth by Justice Martin of the Court of Appeal and are summarized here in essentially verbatim form.

Gary A. Mitchell and Bette Gae Mitchell are two of more than one hundred plaintiffs who reside near the Thompson-Hayward Chemical Plant near Fresno, California. Petitioners and the other plaintiffs have filed lawsuits alleging contamination of the air and ground water in the vicinity of their homes. Plaintiffs allege the underground aquifer has been contaminated by the chemical dibromochloropropane (DBCP) which was used as an agricultural soil fumigant to kill microscopic, parasitic root worms known as nematodes. They sued a number of entities who manufactured, marketed and distributed DBCP and other involved chemicals.

Plaintiffs' second amended complaint seeks compensatory and punitive damages based upon seven causes of action for personal injuries and property damage, including one for intentional infliction of emotional distress. Plaintiffs assert that the water contamination has caused them "considerable emotional pain, anguish and distress, since they are aware that DBCP and the other chemicals are highly toxic and carcinogenic and can produce sterility and genetic damage."

In the course of discovery, defendant T.H. Agriculture and Nutrition Company, Inc. propounded a number of interrogatories to plaintiff Bette Gae Mitchell. The interrogatories and answers relevant to the instant case are selectively reprinted below:

"INTERROGATORY NO. 29:

"Have you ever read or heard any warnings of any kind about DBCP? If so, please state as to each such warning:

"a. Was it written or oral?

"b. The specific nature of the warning;

"c. The name and address of the person or organization who issued the warning;

"d. The date(s) you read or heard the warning(s);

"e. The name and address of the custodian of all written warnings."

"ANSWER TO INTERROGATORY NO. 29:

"a. Written and oral.

"b. Physician recommended filter for well to avoid cancer in family members; Dept. of Health recommended same; media articles stating link between DBCP and cancer, infertility and defects.

"c. Robert W. Lusk, M.D., 6700 North First St., Suite 114, Fresno, Ca. 93710. Cal. Dept. of Health Services, 5545 E. Shields, Fresno, Ca. 93727. *Fresno Bee* articles. 'American Health,' magazine article, July-August 1982 issue. Attorneys, covered by attorney-client privilege.

"d. Approximately May of 1981 to present.

"e. Myself.

". . . . . . . . . . . . . . . . . . . . . . . . . . ."

"INTERROGATORY NO. 36:

"Have you ever discussed with any person (other than with your attorney, in private) any warnings of any kind about possible dangers or side effects which could result from exposure to DBCP? If so, for each such discussion state:

"a. The location where the discussion occurred;

"b. The date of the discussion;

"c. The names and addresses of all persons present;

"d. The topics discussed;

"e. The contents of the warnings that were discussed;

"f. Whether the warning(s) was(were) written or oral;

"g. The name of the person or organization who issued the warning(s) and the date the warning(s) was(were) issued;

"h. If any notes or other written memoranda referring to the discussion exist, please identify and provide the name and address of the present custodian."

"ANSWER:

"36. Have discussed with friends, family, neighbors, physicians, attorneys; cannot recall dates on specific discussions."

In March and May 1983, defendants took the deposition of Bette Gae Mitchell. During her deposition she stated that all the sources of information she had about DBCP contributed to her distress, as evidenced by the following questions propounded to her and her answers:

"Q. Is it true that all of the various sources of information that you have about DBCP have contributed in one way or another to the emotional distress that you suffer over the presence of DBCP in your water?

"MR. KRAMER: Which sources are you alluding to?

"THE WITNESS: You're talking about all the sources I've ever had?

"MR. CONANT: Right.

"A. Have they contributed to my emotional—you're talking about the letters I've gotten from the State and everything?

"Q. I'll include those.

"A. Well, yes, because it's all pertaining to me. And that's my only way of finding out anything, is reading it or seeing it or something."

During the course of that deposition, defendant sought information about the dates, times and other circumstances of Bette Mitchell's conferences with her attorneys. Defendants sought to elicit details about the nature and content of any warnings, as well as information or documents she received from her attorneys regarding the health effects of DBCP. As to each of these 21 questions, plaintiff's attorney invoked the attorney-client privilege and instructed Bette Mitchell not to answer.

On August 9, 1983, defendant Shell Oil Company moved for an order to compel answers to the questions which Bette Mitchell declined to answer

on instructions of counsel. Defendants contended that these questions were critical to the issues of emotional distress causation and were either not privileged from the outset, or alternatively, that any privilege that existed had been waived. The superior court granted the motion to compel answers to each of the following questions:

"QUESTION No. 1: What percentage of your—of the warnings that you have received have come from your attorneys?

"QUESTION No. 2: When did you receive warnings from your attorneys with respect to the DBCP?

"QUESTION No. 3: On how many different occasions did you receive warnings from your attorneys with respect to DBCP?

"QUESTION No. 4: On those occasions when you received warnings from your attorneys with respect to DBCP, who was present?

"QUESTION No. 5: When did you first meet Mr. Kramer here?

"QUESTION No. 6: Is it true that your attorneys warned you about DBCP from May of 1981 to present, as is indicated in subpart D of your answers to interrogatories?

"QUESTION No. 7: Did your attorneys warn you orally or in writing concerning DBCP?

"QUESTION No. 10: And what, in fact, did your attorneys tell you when they warned you about DBCP?

"QUESTION No. 12: And is it true that the warnings that your attorneys gave you about DBCP contributed to that anxiety?

"QUESTION No. 13: One of the sources of information you have about DBCP is information that you gained from your attorneys; is that correct?

"QUESTION No. 15: Mrs. Mitchell, have you received any written information from your attorney about health effects of DBCP?

"QUESTION No. 16: Have you received any written information from your attorney about the potential of DBCP to cause cancer in humans?

"QUESTION No. 17: Have you received any written information from your attorney about the potential of DBCP to cause cancer in animals?

"QUESTION No. 19: Have you received any other relevant information from your attorney about the potential for DBCP to cause cancer in humans?

"QUESTION No. 20: Have you received any other relevant information from your attorneys about the human health effects of DBCP?"

The court indicated that questions 1 through 7, 12 and 13 had nothing to do with the content of the communication and were not subject to the privilege in any event. The court further indicated questions 10, 16, 17, 19 and 20 related to the content of a communication, but that the privilege had been waived.

*The Attorney-client Privilege*

■ The attorney-client privilege has been a hallmark of Anglo-American jurisprudence for almost 400 years. (McCormick, Evidence (2d ed. 1972) § 87, pp. 175-179; 8 Wigmore, Evidence (McNaughton rev., 1961) § 2290, pp. 542-545; *Pritchard* v. *U.S.* (6th Cir. 1950) 181 F.2d 326, 328, affd. (1950) 339 U.S. 974 [94 L.Ed. 1380, 70 S.Ct. 1029]; *Baird* v. *Koerner* (9th Cir. 1960) 279 F.2d 623, 629 [95 A.L.R.2d 303].) The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client. (Evid. Code, § 950 et seq.)[1] Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. (*People* v. *Flores* (1977) 71 Cal.App.3d 559, 563 [139 Cal.Rptr. 546].) In other words, the public policy fostered by the privilege seeks to insure "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." (*Baird* v. *Koerner, supra,* 279 F.2d at p. 629.)

■ Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship. As this court has stated:

---

[1]The privilege is set forth in Evidence Code section 954 as follows:

"Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:

"(a) The holder of the privilege;

"(b) A person who is authorized to claim the privilege by the holder of the privilege; or

"(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure."

"The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence." (*City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.2d; accord *People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633].)

■ In California the privilege has been held to encompass not only oral or written statements, but additionally actions, signs, or other means of communicating information. (*Ex Parte McDonough* (1915) 170 Cal. 230, 234 [149 P. 566]; *Estate of Kime* (1983) 144 Cal.App.3d 246, 255 [193 Cal.Rptr. 718].) Furthermore, the privilege covers the transmission of documents which are available to the public, and not merely information in the sole possession of the attorney or client. In this regard, it is the actual fact of the transmission which merits protection, since discovery of the transmission of specific public documents might very well reveal the transmitter's intended strategy. (*In re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371, 526 P.2d 523].) ■ While it is perhaps somewhat of a hyperbole to refer to the attorney-client privilege as "sacred,"[2] it is clearly one which our judicial system has carefully safeguarded with only a few specific exceptions.

■ In the case at bar, defendants contend that much of the information which they sought to discover through their questions to plaintiff Bette Mitchell was not privileged from the outset since it did not involve "confidential communications between client and lawyer." The trial court agreed with regard to at least nine of the questions put to Ms. Mitchell at her deposition, questions 1 through 7, 12 and 13 (quoted *ante,* at p. 598).

Evidence Code section 952 defines the term "confidential communication between client and lawyer" as "information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

---

[2]See *People* v. *Kor* (1954) 129 Cal.App.2d 436, 447 [277 P.2d 94] (Shinn, J., conc.).

In the present matter, all of the questions directed to plaintiff Bette Mitchell, with the exception of questions Nos. 4 and 5,[3] can only properly be characterized as *within* the scope of "confidential communications" protected by the attorney-client privilege. Each of these questions presuppose a communication between attorney and client, in which the attorney warned the client about the effects of DBCP, and cannot be answered without impliedly affirming that such conversation occurred. Thus, these questions clearly involved information transmitted between Ms. Mitchell and her attorney in the course of their relationship as client and lawyer, as well as advice given by Mr. Kramer to his client in the course of such professional relationship.

Real parties' further contention that their inquiries about warnings to Ms. Mitchell from her attorney are not privileged since they involve "factual information" as opposed to "legal advice" must similarly be rejected. Neither the statutes articulating the attorney-client privilege nor the cases which have interpreted it make any differentiation between "factual" and "legal" information. (*In re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371, 526 P.2d 523]; *In re Navarro* (1979) 93 Cal.App.3d 325, 328-329 [155 Cal.Rptr. 522].) Moreover, Ms. Mitchell's counsel clearly transmitted information about DBCP to his client in the context of investigating, preparing and prosecuting a lawsuit, not simply in an abstract lecture to a friend on the health effects of that particular chemical. In sum, the sought after information clearly falls within the purview of the attorney-client privilege.

## Waiver of the Privilege

■ Having thus established that virtually all of real parties' questions to plaintiff at her deposition would ordinarily be covered by the attorney-client privilege, we must next inquire whether any waiver of this privilege has occurred. Evidence Code section 912 specifically provides that waiver of the attorney-client privilege, as well as other recognized privileges, occurs when any holder of the privilege "has disclosed a significant part of the communication or has consented to such disclosure made by anyone. . . ." Defendants have contended that by stating in response to an interrogatory and subsequent questions at deposition that she discussed DBCP with her attorneys, plaintiff has waived the attorney-client privilege by disclosing "a

---

[3]Question No. 5 is *not* covered by the attorney-client privilege since it merely asks the date on which Ms. Mitchell first met her attorney. (*Coy* v. *Superior Court* (1962) 58 Cal.2d 210, 219 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678].) Question No. 4 would be exempted from the privilege only to the extent that it was intended to discover whether the communications between Ms. Mitchell and her attorney were not made in confidence (i.e., whether they were intentionally made in the presence of nonprivileged parties). To the extent that the question seeks any information about their confidential communications, it is covered by the privilege.

significant part of the communication." Such a contention, however, cannot be sustained. Relevant case law makes it clear that mere disclosure of the fact that a communication between client and attorney had occurred does *not* amount to disclosure of the specific content of that communication, and as such does not necessarily constitute a waiver of the privilege.

In *People* v. *Perry* (1972) 7 Cal.3d 756 [103 Cal.Rptr. 161, 499 P.2d 129] (disapproved on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]), this court stressed that the waiver of a psychotherapist-patient privilege under Evidence Code section 912 required that the holder disclose a significant part of the communication. In *Perry,* counsel for defendant sought permission to review psychotherapy records pertaining to the treatment of the principal prosecution witness, while the Mental Health Department asserted the privilege on the witness' behalf. In rejecting defendant's argument that the witness had waived the privilege under Evidence Code section 912, we stated: "[I]n the trial court, Perry's counsel argued that Diana waived her psychotherapist privilege by giving certain testimony on cross-examination. We have reviewed the statements Diana made at trial and are satisfied that she did not disclose a significant part of any communication with any psychotherapist. At most, her testimony disclosed that she had consulted two psychiatrists; she did not reveal the substance of her consultations. Mere admission that a psychotherapist-patient relationship exists does not disclose 'a significant part of the communication.' (See *In re Lifschutz* (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].)" (*People* v. *Perry, supra,* 7 Cal.3d at pp. 782-783.) In the present matter, plaintiff's answers, while revealing the existence of her attorney-client relationship, *at most* affirmed that she had discussed certain warnings with her attorneys, and in no way revealed a significant part of the substance of those discussions.

Recently, in *Travelers Ins. Companies* v. *Superior Court* (1983) 143 Cal.App.3d 436 [191 Cal.Rptr. 871], the Court of Appeal found no waiver of the attorney-client privilege under section 912 in a legal malpractice action. There, plaintiff served various interrogatories on defendant and also served a request for production of documents on Travelers, seeking its entire claims file on the malpractice dispute. In holding that the sought-after communications between defendant and his client insurance company were in fact privileged, the Court of Appeal emphasized that while defendant had acknowledged discussing the matter with his client, his answers had not reached the point of substantial disclosure at which the privilege had ceased to operate. As the Court of Appeal correctly noted: "Relatively few reported cases interpret Section 912, subdivision (a); none is definitive on the question before us. The answer turns, of course, on determination of *whether Klein's answers were wide enough in scope and deep enough in substance*

*to constitute 'a significant part of the communication.' We think not. His answers, at most, were preliminary and foundational—and quite vague. He did not provide the specifics the interrogatories were doubtless intended to produce. Any really 'significant part of the communication' required by the statute remained unsupplied."* (143 Cal.App.3d at 444; see *People* v. *Kor, supra,* 129 Cal.App.2d at p. 447; italics added.)

In a similar vein, it is readily apparent that plaintiff here did not waive her attorney-client privilege through her mere acknowledgment of the fact that she had discussed warnings about DBCP with her attorney. This meager admission did not disclose any of the actual substance or content of those discussions, and as in *Travelers,* the client's answers did not reveal the very specifics which the interrogatories were designed to produce. In this context, we are not persuaded that plaintiff's responses disclosed "a significant part of the communication" with her attorneys, for such a conclusion would require considerably more depth and specificity than were present in Ms. Mitchell's answers. As such, we do not find any waiver of the attorney-client privilege under Evidence Code section 912.

*Implied Waiver of Privilege*

■ Although Evidence Code section 912 represents the only conceivable basis for finding a statutory waiver of privilege in this matter, defendants submit an additional contention as to why they are entitled to full discovery of communications between plaintiff and her attorneys. In short, they argue that there has been an implied waiver of the attorney-client privilege because plaintiff has tendered a cause of action for emotional distress, and all evidence relevant to this issue should therefore be discoverable. In so contending, defendants suggest that the only way to ascertain the genuineness and legitimacy of plaintiff's claim for emotional distress damages is by exploring her discussions with her attorneys relating to the health effects of DBCP. The trial court generally agreed with this reasoning in finding a waiver of the privilege. Essentially, it held that by seeking damages for emotional distress based on the harmful effects of DBCP, plaintiff put the information from her attorneys at issue, since such information might help determine the genuineness and reasonableness of her claim (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]).[4]

---

[4]At the hearing on the motion to compel answers, the following exchange occurred between the court and plaintiff's counsel:

"MR. KRAMER: Your Honor, if I said to my client, if I gave her advice about a legal opinion—for example, DBCP is defective, which is legal advice—would the defendants have the right to get to that?

"THE COURT: If that contributes to her emotional distress.

"MR. KRAMER: Well, it's legal advice given to my client which, in my mind, is strictly

Defendants cite a number of California cases as supporting the proposition that "fundamental fairness" may require disclosure of otherwise privileged information or communications where plaintiff has placed in issue a communication which goes to the heart of the claim in controversy. While we do not disagree with this general proposition, we do not find it applicable to the facts of the instant matter and distinguish each of the cases relied upon by real parties.

*In re Lifschutz* (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1], involved a suit for civil assault in which a plaintiff who claimed emotional distress disclosed at deposition that he had received psychiatric treatment from Dr. Lifschutz. When defendant subpoenaed the doctor for deposition, the latter refused to answer any questions relating to his treatment of the plaintiff. The trial court ruled that because the plaintiff, by instituting the pending litigation, had tendered as an issue his mental and emotional condition, the statutory psychotherapist-patient privilege (Evid. Code, § 1010 et seq.) should not apply. This court subsequently affirmed that determination. However, unlike the instant matter, the court's ruling was based on a *specific statutory exception* to the psychotherapist-patient privilege—the patient-litigant exception, which is set forth in Evidence Code section 1016.[5] There is no such specific statutory exception applicable to the attorney-client privilege in the case at bar. Indeed, since we have already found that the attorney-client privilege was not waived under section 912 or any other statutory exception set forth in the Evidence Code, real parties' reliance on *In re Lifschutz,* which involved a different privilege and a specific statutory exception thereto, is unfounded.

Similarly, *Fremont Indemnity Co.* v. *Superior Court* (1982) 137 Cal.App.3d 554 [187 Cal.Rptr. 137] offers no substantiation to the arguments of real parties. In that case, plaintiff brought a civil action against his

---

privileged. I'm just afraid I can't even talk to my clients anymore about their case, about what's in their water. And I believe that deteriorates the attorney-client privilege incredibly.

"THE COURT: If what you tell the client is going to be an element of damage, it's discoverable in my opinion.

"MR. KRAMER: I understand your position.

"THE COURT: You can't have damages based on something that is secret.

"MR. KRAMER: But isn't that for the jury to ascertain, her emotional distress? The defendants will put on their evidence as to DBCP, plaintiff will put their experts on as to the risks of DBCP, plaintiff will state what she believes about DBCP; and won't it be up to the jury to weigh that evidence and make a final conclusion?

"THE COURT: Maybe, but the defendants have an absolute right, in my opinion, to discover the sources of that information and what the information was. Just like if you're going to rely on it as a basis for damage, the jury is going to have to be informed."

[5]Evidence Code section 1016 provides in pertinent part: "There is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by: (1) The patient; (b) Any party claiming through or under the patient; . . ."

insurer to recover under a fire insurance policy and alleged bad faith refusal to settle this claim by the insurance company. During the course of discovery, plaintiff was indicted for arson and refused to give his deposition, asserting his constitutional privilege against self-incrimination. The *Fremont* court ordered plaintiff to answer or abandon his claim, noting the following language from *Wilson* v. *Superior Court* (1976) 63 Cal.App.3d 825, 830 [134 Cal.Rptr. 130]: ". . . 'the gravamen of [his] lawsuit is so inconsistent with the continued assertion of [a] privilege as to compel the conclusion that the privilege has in fact been waived.'" (137 Cal.App.3d at p. 559.) In *Fremont,* the court correctly characterized the sought-after testimony as "vitally relevant" to an issue (arson) which was necessarily raised by plaintiff's claim. Discovery of this information was clearly essential to a fair resolution of the case, since a finding of arson would have provided a complete defense for defendant insurers. Such cannot be said for the testimony in question in the case at bar, for as we shall see, it does not go to the heart of plaintiff's claim for emotional distress. Thus, the basis for the court's ruling in *Fremont* is simply not applicable here.

In like manner, real parties' reliance on *Merritt* v. *Superior Court* (1970) 9 Cal.App.3d 721 [88 Cal.Rptr. 337] is equally misplaced. *Merritt* involved a lawsuit against an insurance company for bad faith refusal to settle within policy limits. It was brought by the injured plaintiff as assignee of the insured's cause of action, and it alleged that counsel for the insurer had so confused plaintiff's counsel as to disable plaintiff from settling the case within policy limits. The insurer sought discovery of certain communications by plaintiff's attorney during preparation of the underlying lawsuit. The *Merritt* court upheld disclosure on the ground that plaintiff had placed in issue the decisions, conclusions and mental state of his then attorney by alleging that this attorney's confusion led to the failure to settle. Since plaintiff was necessarily forced to prove his case by reference to the mental state of his counsel, the defendant was entitled to inquire into communications relating to that state.

Subsequent cases, however, have properly distinguished *Merritt* "as being limited in its application to the *one situation* in which a client has placed in issue the *decisions, conclusions, and mental state of the attorney who will be called as a witness to prove such matters.*" (*Estate of Kime, supra,* 144 Cal.App.3d at p. 259, citing *Lohman* v. *Superior Court* (1978) 81 Cal.App.3d 90 [146 Cal.Rptr. 171]; *Miller* v. *Superior Court* (1980) 111 Cal.App.3d 390 [168 Cal.Rptr. 589]; *Schlumberger Ltd.* v. *Superior Court* (1981) 115 Cal.App.3d 386 [171 Cal.Rptr. 413].) (First italics added.) In the instant matter, the state of mind of plaintiff's attorneys is clearly not at issue, and plaintiff has no need to prove her case by reference to the conclusions or mental state of her counsel. *Merritt* is thus unquestionably in-

apposite. In sum, defendants' contention that plaintiff should be required to disclose otherwise privileged communications with her attorneys on the grounds of an implied waiver of such privilege does not find support in the case law on which real parties themselves rely.[6]

Plaintiff, on the other hand, has pointed out several cases which limit the implied waiver principle under circumstances analogous to those present in the instant matter. These cases have declined to find a waiver of the attorney-client privilege where the substance of the protected communication is not itself tendered in issue, but instead simply represents one of several forms of indirect evidence in the matter. Plaintiff correctly contends that her case does not involve the withholding of crucial evidence on the central issue tendered by the party claiming privilege, noting that she will attempt to prove her emotional distress claim without reference to confidential communications with her attorneys. She further correctly argues that her various claims have *not* put into issue her attorneys' state of mind and that in fact the real issues are *her* knowledge and state of mind, evidence of which may be ascertained directly from her, without an examination of the information on DBCP transmitted by her attorneys. In examining these contentions, we turn first to the cases on which plaintiff relies.

In *Miller* v. *Superior Court, supra,* 111 Cal.App.3d 390, plaintiff brought a malpractice action against her former attorney. Defendant raised a statute of limitations defense and in discovery asked plaintiff about her communications with other attorneys following the alleged malpractice. Defendant's intention was to discover the content of plaintiff's communications with these other attorneys on the grounds that those communications would tend to show the point at which plaintiff became aware of the necessary facts for her claim. Plaintiff named seven attorneys she had consulted but refused to disclose the content of her communications. In reversing a trial court's order compelling plaintiff to answer, the Court of Appeal concluded that discovery was improper, relying on the analogous case of *Lohman* v. *Superior Court, supra,* 81 Cal.App.3d 90, to substantiate its analysis: "We distinguished *Merritt* on the ground that there the plaintiff specifically put in issue his counsel's state of mind, whereas in *Lohman* it was only the plaintiff's knowledge which was placed in issue. The same distinction applies here. Petitioner Florrie Miller's state of knowledge is clearly in issue and may be proved by any competent evidence available to real parties. However, the

---

[6]Two other cases cited by real parties, *Newson* v. *City of Oakland* (1974) 37 Cal.App.3d 1050 [112 Cal.Rptr. 890] and *Wilson* v. *Superior Court, supra,* 63 Cal.App.3d 825 are also inapposite to the case at bench. Among the several reasons for this conclusion is the fact that both cases involve a plaintiff's claims of privilege as to income tax returns, and, income tax returns, unlike attorney-client communications, are not covered by a specific *statutory* privilege.

mere fact that her state of mind is in issue does not cause a waiver of her privilege concerning confidential communications between her and attorneys she consulted after the alleged malpractice. There is no statutory waiver in such circumstances, and no basis for creating a nonstatutory waiver. To do so would create an intolerable burden upon the attorney-client privilege, making it very difficult for the parties to the relationship to openly discuss matters which might eventually lead to litigation." (111 Cal.App.3d 390, 394-395.)

Similarly, in the case at bench, Ms. Mitchell's knowledge about the health hazards of DBCP is both relevant and discoverable, but the content of what she was told by her attorneys has not been put in issue and remains protected by the attorney-client privilege.

In an equally relevant case, *Schlumberger, Ltd.* v. *Superior Court, supra,* 115 Cal.App.3d 386, a legal malpractice defendant sought discovery of the communications between plaintiff and the attorneys he later engaged to minimize the damage from defendant's malpractice and to prosecute the malpractice claim. Defendant there contended that the advice given by plaintiff's present attorneys bore directly on the issue of damages, because, defendant argued, the damages sued for resulted not from his own failings but rather from the advice and actions of current counsel. In rejecting this argument and upholding the privilege, the Court of Appeal emphasized: "Privileged communications do not become discoverable because they are related to issues raised in the litigation. . . . If tendering the issue of damages in a malpractice action waived the privilege, there would be no privilege, and Evidence Code section 954 would be meaningless." (115 Cal.App.3d at p. 393.)

*Schlumberger* is particularly relevant to our consideration of the instant matter because real parties here have strongly suggested that much of plaintiff's alleged damages for emotional distress resulted from fear induced by the advice and actions of her counsel. We note, however, that plaintiff never has claimed that information supplied by her counsel caused her emotional distress. Indeed, her complaint alleged only that the contamination of the Mitchells' ground water and air caused grievous personal injuries and severe emotional distress. The complaint further alleged that the toxic substances contaminated their dwellings, reducing the value of the property and rendering it unfit for human habitation or farming. Clearly, neither these allegations nor plaintiff's mere acknowledgment that she had discussed warnings about DBCP with her attorneys put those privileged communications at issue.

Defendants apparently contend, however, that plaintiff, by alleging a cause of action for emotional distress, has thereby rendered discoverable

the source and substance of *all* information which she has received about DBCP. They argue that such discovery is necessary in order to determine the "genuineness" of plaintiff's claim for emotional distress.

Plaintiff, while acknowledging that the reasonableness and genuineness of her fears is a legitimate concern, particularly in assessing the amount of damages, submits that the issue can be properly litigated without such a broad invasion of the attorney-client privilege. We agree. As plaintiff correctly contends, the principal measure of reasonableness is whether her fears square with scientifically proven or suspected effects of DBCP, a relatively objective test which can be applied by a trier of fact without delving into all her sources of information or misinformation. Moreover, defendants will have ample opportunity to show why plaintiff's fears are unreasonable or exaggerated and to exploit any gaps in the evidence as to her sources of information. Additionally, even if the communications in question were potentially relevant to the issue of damages, the attorney-client privilege would still operate to exclude them. As we noted above, courts and legislatures have long recognized that the privilege will at times shield from view otherwise relevant evidence. This court has no intention of abandoning that principle here.

Both parties urge that *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916 and *Rodrigues* v. *State* (1970) 52 Hawaii 156 [472 P.2d 509] support their respective positions. Significantly, both *Molien* and *Rodrigues* involved claims for *negligent* infliction of emotional distress, *unaccompanied by physical injury,* whereas plaintiff's claim here is for *intentional* infliction of emotional distress, accompanied by personal injuries, property damage and other monetary losses. In *Molien,* this court distinguished intentional infliction of emotional distress thusly: "Finally, intentional torts will support an award of damages for emotional distress alone, but only in cases involving 'extreme and outrageous intentional invasions of one's mental and emotional tranquility.' (*Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d at p. 498.) As we explained in *State Rubbish, etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282], *it is outrageous conduct that serves to insure that the plaintiff experienced serious mental suffering and convinces the courts of the validity of the claim.*" (27 Cal.3d at p. 927, italics added.)[7]

---

[7]Similarly in *Rodrigues* v. *State, supra,* the Hawaii Supreme Court stated: "Of course, the modern cases have abandoned the parasitic approach where the infliction of mental distress is an *intentional* act, *relying on the element of outrage in such cases as a guarantee of genuine and serious mental distress.*" (52 Hawaii 156, 171, italics in original and italics

Such language strongly suggests that it is evidence of *defendant's conduct* which guarantees the "genuineness" of a claim for emotional distress. In this vein, it should thus be noted that plaintiff here will bear the burden of producing such evidence regarding defendants' conduct, and that such proof will undoubtedly focus on objective scientific and expert evidence, as opposed to any confidential communications which plaintiff had with her attorneys.

*Molien* further distinguished cases where emotional distress is the only damage claimed from those where, as in the instant matter, emotional distress is merely one of several causes of action: "Another [assurance of the validity of the claim] arises when the plaintiff asserts an independent cause of action apart from personal injury. . . . 'Obviously, where, as here, the claim is actionable and has resulted in substantial damages apart from those due to mental distress, the danger of fictitious claims is reduced, and we are not here concerned with mere bad manners or with trivialities but tortious conduct resulting in substantial invasions of clearly protected interests.' [Citations.]" (27 Cal.3d at p. 927, italics added.)

In sum, we do not find that plaintiff has put the information gained through otherwise privileged communications with her attorneys directly at issue, nor do we find that disclosure of such communications will be necessary to a fair adjudication of her claim for emotional distress.

*Public Policy Considerations*

Finally, both parties have suggested that the public policies of this state provide support for their respective positions. While we agree with the importance of balancing these competing interests, the circumstances of this matter weigh ultimately in favor of preserving the attorney-client privilege. First, we note that disclosure of the sought-after confidential communications may carry significant implications not only for the attorney-client privilege but also for the attorney work-product doctrine.[8] Plaintiff's attorneys

---

added.)

In addition, in *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288 [131 Cal.Rptr. 547], the court held that plaintiff had presented substantial evidence to support her claim for intentional infliction of mental distress, citing Restatement Second of Torts, section 46, comment k, and stating: "The language [of the Restatement] emphasizes *the need to 'look for more in the way of outrage as a guarantee that the claim is genuine'*. . . . [¶] Appellant presented substantial evidence that respondents' behavior was outrageous in that they acted knowingly and unreasonably with the intention to inflict mental distress. . . . The total course of conduct exhibited by respondents meets the tests of outrageous conduct . . . ." (60 Cal.App.3d at pp. 296-298, italics added.)

[8]The attorney work-product doctrine is codified at Code of Civil Procedure section 2016, subdivision (g), which provides: "It is the policy of this state (i) to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases and (ii) to prevent an attorney from taking undue advantage of his adversary's industry or efforts."

here have consistently maintained that permitting the discovery sought by real parties will function primarily to reveal much of their investigative efforts on behalf of their clients as well as significant aspects of their trial strategy. While this remains a matter of speculation at this point, we fully recognize the importance of safeguarding the confidentiality of an attorney's files and work efforts and permit examination of such material only in exceptional circumstances. (*Hickman* v. *Taylor* (1947) 329 U.S. 495, 511 [91 L.Ed. 451, 462, 67 S.Ct. 385]; *Popelka, Allard, McCowan & Jones* v. *Superior Court* (1980) 107 Cal.App.3d 496, 501 [165 Cal.Rptr. 748].)

In a related vein, we take note of plaintiff's contention that permitting discovery in the case at bar will have important ramifications for the attorney-client privilege and work-product doctrine in many other cases which involve claims for emotional distress. If discovery were granted here, it is logical to expect that in most personal injury cases where emotional distress is alleged by reason of feared future consequences, defense counsel would seek to discover whether those potential consequences had been discussed between client and counsel and if so, whether that discussion had contributed to plaintiff's distress. Since it is likely that such discussions do in fact occur in most cases, the door would then be open for broad discovery of previously privileged communications. While such discovery would nominally be intended to produce evidence relating to the damages issue, it might very well reveal much of plaintiff's investigative efforts and trial strategy. Limitations on the scope of this discovery would be very difficult to fashion.

Moreover, the mere knowledge of such potential discovery would place significant burdens on any attorney representing a plaintiff with an emotional distress claim. Such an attorney might be very reluctant to even discuss potential future consequences with a client—a subject which is part and parcel of the normal attorney-client relationship—for fear that such discussion would afford a defendant broad discovery of otherwise privileged information. If an attorney cannot freely express opinions and impart knowledge on all issues on which he or she is consulted, the value of that attorney's services to the client is substantially diminished. Clearly, therefore, the situation described above would portend a substantial and unwarranted invasion of both the attorney-client privilege and the work-product doctrine.

Furthermore, to permit discovery of the attorney-client communications in this instance raises an equally troubling concern. Such a holding would potentially uphold a harassment tactic whereby defendants such as these are able to shift the focus of the case from damages caused by chemical pollutants to damages caused by allegedly inflammatory or false information provided by self-serving attorneys. Although real parties here do not explicitly impugn the motives of plaintiff's lawyers, the implications of their argu-

ments are unmistakably clear. In other similar cases, defendant chemical manufacturers have contended that plaintiffs' injuries were caused not by exposure to toxic chemicals but rather by hysteria induced by plaintiffs' doctors. Once again, this technique not only obfuscates many of the substantive issues in a case but also frequently places the wrong "defendant" on trial. Quite simply, such tactics should not be tolerated in the courts of this state.

After weighing the various legal and policy arguments propounded by the parties, we are persuaded that to permit discovery of the confidential communications here would constitute an unwarranted abrogation of the attorney-client privilege—a privilege which is fundamental to the free and open exchange of information and advice between lawyers and their clients, and more broadly to the proper functioning of our judicial system. We thus conclude that the information sought by defendant real parties, with the limited exception of Questions 4 and 5 as discussed above, is covered by the attorney-client privilege and that no waiver of that privilege has occurred. Let a writ of mandate issue, ordering respondent superior court to vacate its order compelling discovery.

Bird, C. J., Mosk, J., Kaus, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

The petition of real parties in interest for a rehearing was denied February 14, 1985, and the opinion was modified to read as printed above.