In re Glenn P. COUCH III, Debtor.

**Harold S. TAXEL, Trustee,
Plaintiff/Appellee,**

**v.**

**EQUITY GENERAL INSURANCE CO.,
an Illinois corporation,
Defendant/Appellant.**

Civ. No. 87–1014–E.

Adv. No. C85–0877–LM7.

United States District Court,
S.D. California.

Nov. 20, 1987.

James D. Baskin, III, Stephen K. Haynes, Hill & Baskin, San Diego, Cal., for plaintiff/appellee.

Kathleen McCormick, Law Offices of McCormick and Royce, P.C., San Diego, Cal., James R. Robie, Maria Louise Cousineau, Robie & Matthai, P.C., Los Angeles, Cal., for defendant/appellant.

## MEMORANDUM DECISION

ENRIGHT, District Judge.

### STATEMENT OF FACTS

This appeal arises out of the bankruptcy court's order compelling discovery in an

action against an insurer for alleged failure to pay benefits under a liability policy. The trustee, of the debtor Glenn Couch (Chapter 7 proceeding), has brought a direct action against the insurer.

Equity General Insurance Company issued an insurance agent's errors and omissions policy covering the Marler Transit Risk Insurance Agency corporation and its principal Terry Marler (Marler). According to the allegations of Glenn Couch (Couch), in July 1981 Marler agreed to obtain (and subsequently represented that he had obtained) a marine insurance policy indemnifying Couch against any loss to the motor vessel and the personal property aboard the vessel. Marler allegedly failed to satisfy this promise. The vessel sank, and it was uninsured. Couch sued Marler for an event within the coverage of Marler's professional liability policy.

Equity General states that it undertook to defend the action and initiated its own investigation. Investigation revealed that the vessel had been purchased by Couch for $10,000. Only months before it sank, a marine survey of the vessel was conducted, revealing that it required approximately $150,000 in repairs to make it seaworthy. There was also evidence that Couch had transferred title to the vessel before it sank.

Although Marler denied that he had undertaken to obtain insurance as Couch alleged, Marler refused to cooperate in his defense. At his request, defense counsel was changed three times. Nevertheless, Marler continued to refuse to cooperate and specifically refused to have his deposition taken, despite being cautioned by his counsel that this position might cause the court to strike his answer and enter a default judgment against him. In December 1983, the San Diego Superior Court granted plaintiff's motion to strike Marler's answer and in February 1984, default judgment was entered for $91,089. Equity General has refused to pay on the professional liability policy, and the trustee has brought a direct action against Equity General.

Equity General had instituted a declaratory relief action to determine its lack of liability for the default judgment against Marler when it learned that Couch was a debtor in bankruptcy. The trustee declined to stipulate to permit the declaratory relief action to proceed in state court and instead filed his complaint in bankruptcy court.

The trustee has alleged that Equity General is contractually obligated to pay the judgment against Marler and claims a violation of Insurance Code section 790.-03(h)(5)—breach of duty to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. Cal.Ins. Code § 790.03(h)(5). Equity General answered the complaint, denied liability, and raised the affirmative defense that Marler's alleged failure to cooperate in defense of the state court litigation excuses it from liability on the policy of professional liability insurance.

Equity General states that the trustee was given free rein in discovery. Equity General was requested to state whether it created any loss reserve relating to the Couch claim. And, if so, when, what the reserve was, who was responsible for its creation, whether it was ever changed, when and by whom, the nature of any change; the basis for setting any reserve was also requested. (Equity App. 35, Interrogatory No. 12). If no loss reserve was created, Equity General was required to explain why and who made this decision. *Id.,* No. 13. Equity General was further required to state "all of your policies, guidelines or procedures, whether written or unwritten, relating to the creation and amount of loss reserves." *Id.,* No. 14. Equity General objected to these questions on relevance grounds, and to the last, also for disclosure of proprietary and confidential information. (Equity App. 51).

In plaintiff's third set of interrogatories, plaintiff asked whether Equity General had been party to a lawsuit claiming that it had violated California Insurance Code section 790.03 by denying liability or refusing to defend or indicating an intention to do so based upon an insured's failure to cooper-

ate or promptly notify of a potential claim. (Equity App. 46, Interrogatory No. 18). Equity General answered this question affirmatively. The following interrogatory asked Equity General to identify and provide detailed information about each such lawsuit. (Interrogatory No. 19). In its original response, Equity General raised certain objections, but without waiving them, identified 19 lawsuits by name, jurisdiction and case number. (Responses to Plaintiff's Third Set of Interrogatories, pp. 3–4).

This set of interrogatories was accompanied by the trustee's third request for production of documents. Request Number 15, stated in relevant part, that Equity General produce (a) "All pleadings or other documents filed with a court ...; (b) All correspondence to you or from you or of which you have a copy relating to the lawsuit ...; (c) All investigative reports, depositions, or any other documents relating to the lawsuit...." *Id.*, pp. 3–4. Equity General objected to the subdivisions (b) and (c) of request number 15 on the grounds of overbreadth, attorney-client and work-product privileges and violation of its insureds' right to privacy. (Equity App. 64). The trustee moved to compel answers to interrogatories 12, 13, and 14 (and production of related documents) and to compel production pursuant to request for production number 15.

The bankruptcy court granted the trustee's motion, overruled the objections, and ordered Equity General to answer within 30 days. (Taxel App. 93–95). Before its time to answer had expired, Equity General filed an ex parte application with the bankruptcy court for a stay of the order compelling discovery. (Taxel App. 96–109). The trustee opposed the stay and the matter was set for hearing. A chambers conference was held, attended by counsel for both Equity General and the trustee, at which the relevance of the discovery, alternative means of discovery, and Equity General's objections were discussed. Counsel and the court came to an agreement on the scope of discovery to be permitted. Pursuant to that agreement, the trustee pro-

pounded the discovery above that has become the source of this appeal.

When Equity General objected to the discovery, it made claims of attorney-client privilege. Trustee's counsel indicated that the privilege claims were not factually supported, and offered to meet and confer with counsel to resolve the discovery issue. Counsel met on May 18, 1987. The trustee stated that factual support for the claim of privilege was necessary, since it would be impossible to apply California caselaw to determine whether the alleged privilege existed. Equity General refused. The trustee moved to compel discovery. (Taxel App. 121–141). The bankruptcy court rejected the claims of Equity General and ordered them to comply with discovery. Following lodgement and entry of the order, Equity General requested leave to file an interlocutory appeal.

## DISCUSSION

Two issues related to the discovery order are raised by both Equity General and the trustee. The first issue deals with discovery within the attorney-client and work-product privilege. The second issue deals with the discovery of Equity General's policies and procedures for setting loss reserves.

### I.

*Privilege*

Plaintiff, Equity General, asserts that the bankruptcy court's order compelling disclosure of all of the non-public contents of the insurer's files relating to nineteen other lawsuits violates the attorney-client and work-product privilege. They allege that the trustee's request for production of documents number 15 specifically requests not only pleadings and other documents filed in court, but non-public documents including all correspondence, investigative reports, depositions, and other documents relating to lawsuits in which they are a defendant.

Equity General comments that insurance companies have the right to due process of law, including the right to defend itself

with the assistance of counsel. *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). *Accord, Mendoza v. Small Claims Court,* 49 Cal.2d 668, 673, 321 P.2d 9 (1958) ("The right to a hearing includes the right to appear by counsel."). This includes the right to communicate in confidence with their attorneys, and that this remains true—notwithstanding allegations of bad faith. *See, e.g., Aetna Casualty & Surety Co. v. Superior Court,* 153 Cal.App.3d 467, 477, 200 Cal.Rptr. 471 (1984). They assert if this were not true "bad faith claims would surely proliferate as a new device for obtaining discovery." *Id.*

Equity applies the same principles to their claim of work-product privilege. They argue that the bankruptcy judge's order for disclosure requires production of the entire contents of their files regarding eleven matters still in litigation. Although Equity contends that the harm of compelled disclosure of material covered by the privilege is the greatest while the lawsuit is still active, they find the privilege extends beyond the end of the litigation. *Fellows v. Superior Court,* 108 Cal.App.3d 55, 63, 166 Cal.Rptr. 274 (1980).

Further, Equity maintains that in California the attorney is regarded as the exclusive holder of the work-product privilege. Although the privilege can be asserted by the client, it cannot be waived by the client. *Lasky, Haas, Cohler, & Munter v. Superior Court,* 172 Cal.App.3d 264, 270, 218 Cal.Rptr. 205 (1985).

The trustee argues that the necessary predicate for a claim of privilege, either the attorney-client or work-product privilege, has not been established by Equity General. He relies on authority that states that a party asserting a claim of privilege "carries the burden of showing that the evidence which it seeks to suppress is within the terms of the statute." *D.I. Chadbourne, Inc. v. Superior Court,* 60 Cal.2d 723, 729, 36 Cal.Rptr. 468, 388 P.2d 700 (1964). *See also Sierra Vista Hospital v. Superior Court,* 248 Cal.App.2d 359, 364–65, 56 Cal.Rptr. 387 (1967).

In applying the law of privilege, within a bankruptcy context, Wright and Graham state: "[r]ule 501 presents difficult problems in bankruptcy because while such proceedings are undoubtedly federal in nature, the bankruptcy court may be required to undertake to determine the validity of state claims." Federal Practice and Procedure, § 5434 (1980). They contend that if a privileged matter is evidence of state claim, and "is in a line of proof that culminates in an element of a state claim or defense, then state rules of privilege apply." *Id.*

The California Evidence Code creates a presumption that certain communications are confidential. It states:

> [w]henever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client ... relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential.

Cal.Evid.Code § 917. Moreover, a court may not compel the party claiming privilege to disclose the allegedly privileged information in order to pass on the claim of privilege. *Id.* at § 915.

A "confidential communication between client and lawyer" includes communications of any kind between lawyer and client, as well as legal opinions formed by the lawyer in the course of the relationship, whether or not actually communicated to the client. *Id.,* § 952, Cal.Law Revision Commission Comment on 1967 Amendment.

> Furthermore, the privilege covers the transmission of documents which are available to the public, and not merely in the sole possession of the attorney or client. In this regard, it is the actual fact of the transmission which merits protection, since discovery of the transmission of specified public documents might very well reveal the transmitter's intended strategy.

*Mitchell v. Superior Court,* 37 Cal.3d 591, 599, 208 Cal.Rptr. 886, 691 P.2d 642 (1984),

*quoting In re Jordan,* 12 Cal.3d 575, 116 Cal.Rptr. 371, 526 P.2d 523 (1974).

Further, the California Supreme Court observed in *Mitchell:*

> The attorney-client privilege has been a hallmark of Anglo–American jurisprudence for almost 400 years. (citation omitted) ... Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual matters. (citation omitted). In other words, the public policy fostered by the privilege· seeks to insure 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.'

*Mitchell v. Superior Court,* 37 Cal.3d 591, 599, 208 Cal.Rptr. 886, 691 P.2d 642 (1985), *quoting Baird v. Koermer,* 279 F.2d 623, 629 (9th Cir.1960).

■ Upon due consideration of the law and policy in this case, this court finds for Equity General, while reversing the discovery order of the bankruptcy court. The information which Equity General seeks to suppress is clearly of a confidential nature within the attorney-client relationship, and allows them to assert the claim of privilege pursuant to California Evidence Code section 917.

A claim of attorney-client privilege imposes upon the party seeking disclosure the burden of establishing lack of confidentiality. Cal.Evid.Code § 917. Here, the trustee has not sustained the burden of establishing lack of privilege. The trustee has offered no evidence to disprove Equity's claim of privilege, and instead has attempted to shift that burden to the defendant. Such an interpretation would violate the intent of Evidence Code section 917 and would vitiate the deference traditionally given to the claim of privilege.

## .II.

### *Loss Reserves*

On the second issue, Equity General asserts that the discovery order compelling disclosure of· information regarding their policies and procedures for setting loss reserves, including specific information regarding any loss reserves in the underlying litigation leading to a third party, is an abuse of discretion. They aver that the discovery order is unfair, contrary to all existing authority and undermines the important public policies underlying California reserve requirements. Further, they state that the trustee has mistakenly characterized a loss reserve as an insurer's estimation of probable or potential liability.

The trustee asserts that the term "loss reserve" means an estimation by Equity General of its possible or potential liability on the professional liability policy issued to Marler. His inquiry into the loss reserve is relevant for many reasons. He states that if Equity General estimated its potential liability on the claim at $70,000, rejection of Couch's $48,500 offer would appear to be bad faith per se. Or if the loss reserve was more than a merely nominal amount, Equity General's complete failure to make settlement offers or counteroffers tends to show bad faith.

> "The term 'reserve' or 'reserves' has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which with accretions from interest, is set aside, 'reserved', as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment."

*Maryland Casualty Co. v. United States,* 251 U.S. 342, 350, 40 S.Ct. 155, 158, 64 L.Ed. 297 (1920).

Equity contends modern statutes generally require insurers to maintain reserves to assure the insurer's ability to satisfy its potential obligations under its policies. *See* 43 Am.Jur.2d Insurance section 28. California is no exception. California Insurance Code section 923.5 provides in pertinent part:

> Each insurer transacting business in the state shall at all times maintain reserves in an amount estimated in the aggregate

to provide for the payment of all losses and claims for which such insurer may be liable and to provide for the expense of adjustment or settlement of losses and claims.

*Id.*

This statute requires that reserves be computed in accordance with regulations promulgated by the Insurance Commissioner. The California legislature specifically enjoined the commissioner to make such regulations "upon reasonable consideration of the ascertained experience and the character of such kinds of business for the purpose of adequately protecting the insured and insuring the solvency of the insurer." *Id.*

With respect to liability insurance, the commissioner's regulations must be consistent with section 11558. That statute provides the reserve requirements prescribed by the commissioner:

> The minimum reserve requirements ... for outstanding losses and loss expenses for each of the most recent three years for coverage included in the lines of business described ... shall not be less than the following:
>
> (b) For liability other than automobile bodily injury ... 60 percent of earned premiums during each year less the amount already paid for losses and expenses incidental thereto incurred during each such year.

Cal.Ins.Code § 11558. Under section 11557, the commissioner must require an insurer to maintain additional reserves whenever existing reserves "seem inadequate to the commissioner." *Id.* at § 11557.

Pursuant to this statutory authority, the commissioner has promulgated a series of regulations. 10 Cal.Admin.Code § 2319 *et seq.* Among other things the commissioner requires that reserves "reflect inflation and development" projected to the date of possible ultimate payment. *Id.*, § 2319.2 subd. (a).

█ As a result of the foregoing, Equity General contends that reserve requirements are grounded in statutory and regulatory language and are only partially within the control of the insurer. This court

agrees, and in doing so reverses the order of the bankruptcy court permitting discovery of Equity General's loss reserves.

The legislature and Insurance Commissioner establish reserve policy. For this reason alone, a reserve cannot accurately or fairly be equated with an admission of liability or the value of any particular claim. *See Union Carbide Corp. v. Travelers Indemnity Co.,* 61 F.R.D. 411, 413 (W.D.Pa.1973) ("The contingent and uncertain nature of reserves" might make questions regarding them tantamount to hypothetical questions.) Further, loss reserves must reflect all potential claim expenses. Any claim in which the insurer undertakes to defend the insured must be reflected in reserves since there will be claim handling expenses, including the attorney's fees and court costs of defense.

### CONCLUSION

Upon consideration of the parties' memoranda and exhibits, the arguments advanced at hearing, and for the reasons set forth above, the court hereby grants the appeal of Equity General and reverses the discovery order of the bankruptcy court.