Filed 10/9/14  Bellows v. Bellows CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GAIL L. BELLOWS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>FREDERICK A. BELLOWS,<br><br>    Defendant and Respondent. | A139994<br><br>(Mendocino County<br>Super. Ct. No. SCUK 09-54755) |

Plaintiff appeals a judgment entered in favor of Frederick (Fred) Bellows on a complaint filed by Gail Bellows and her now deceased husband Donald Bellows individually and on behalf of Donald and Fred's deceased mother, Beverly Bellows, alleging numerous causes of action relating to Fred's handling of Beverly's estate before and after her death.[1] Gail contends, among other things, that the court made prejudicial evidentiary errors, improperly allocated the burden of proof, failed to apply the correct legal standards in determining Beverly's testamentary capacity and Fred's alleged undue influence, and improperly disregarded the principles of law of the case and collateral estoppel in rejecting their claims for breach of fiduciary duty. Most of Gail's contentions are without merit. Moreover, because the outcome of the trial rests primarily on the trial court's acceptance of the testimony of Fred's witnesses, any potential error in the analysis of evidentiary presumptions was harmless. Therefore, we shall affirm the judgment.

---

[1] We refer to the Bellows by their first names.

1

**Factual And Procedural Background**

The operative complaint alleges numerous causes of action against Fred.[2] As relevant to the present appeal, the complaint alleges a cause of action for undue influence on behalf of Beverly, a cause of action for breach of fiduciary duty on behalf of Donald and two causes of actions for financial elder abuse pursuant to Welfare and Institutions Code section 15600 et seq. on behalf of both Donald and Beverly. Following a court trial, judgment was entered in favor of Fred on all causes of action.

The following facts, taken from the trial court's statement of decision, are undisputed and incorporated herein almost verbatim:

Beverly was born in 1914 and lived much of her life in Southern California. Donald and Gail lived in Pomona, California and Fred and his wife Indermill lived in Ukiah. Donald was diagnosed with Parkinson's disease in or about 2000 and died while this case was pending.

In January 2002, Donald and Fred discussed and jointly determined that Beverly was no longer in a position to live by herself. Donald and Gail investigated different adult living facilities in Southern California but considered these facilities too expensive. It was agreed that Beverly would move into the Brookside Retirement Community (Brookside), an independent living facility in Ukiah, in February 2002. On June 10, 2002, Beverly executed a general power of attorney naming Fred her attorney-in-fact.

In June 2002, Fred learned that Beverly's brother Fred Bird was having health issues. Fred and Beverly visited Bird in Southern California and Fred assisted him in obtaining a conservator. Donald was somewhat estranged from Bird. On September 14, 2002, Bird died intestate although a voided will was located, leading to an unsuccessful contest by the beneficiaries named in the will. On June 27, 2003, a probate was

---

[2] The complaint also alleges causes of action against two attorneys, Phillip Vannucci and Myrna Oglesby, as well as Fred's partner Catherine Indermill. The causes of action against Indermill and Oglesby were dismissed prior to trial and plaintiff settled her claims with Vannucci after trial, but before filing the notice of appeal. Fred is the only remaining defendant.

commenced and Fred was appointed the administrator of the Fred Bird estate. Beverly was the sole beneficiary of the intestate estate.

In May 2003, Beverly met with attorney Phillip Vannucci at Brookside to create an estate plan. On June 6, 2003, Beverly executed the Beverly Bellows trust, a "pour-over" will and a durable power of attorney naming Fred as her attorney-in-fact. These documents were prepared by Vannucci. Under the trust, upon Beverly's death Fred would become sole trustee and the assets of the trust would be distributed equally to Fred and to a special needs trust benefitting Donald. The pour-over will provided that her assets not in the trust at the time of death would pass into the trust according to its terms.

In July 2003, Beverly and Fred again met with Vannucci to discuss possible changes to the terms of the trust. Fred had told Vannucci that Beverly wanted to make changes to her trust to leave any inheritance that she might receive from Bird to him. Vannucci met with Beverly at Brookside to discuss the changes but she said she did not want to make any changes. A couple of days later, Vannucci met with Fred and Beverly at his office and Fred reiterated his thoughts about what Beverly wanted to do with the Bird inheritance. Vannucci met with Beverly alone and she again did not want to leave the inheritance to Fred at that time. She was upset at Fred for making her come and she felt pressured. Vannucci was concerned about Fred's influence on Beverly and her state of mind on that day. He made no changes to the trust documents. Vannucci did not see or hear from Beverly again until March, 2005.

On March 18, 2004, following certain probate proceedings, Fred, as administrator of the estate of Fred Bird, issued a check to Beverly in the amount of $433,573.52. On that day, Beverly opened a pay on death (POD) account at National Bank of the Redwoods, under which, upon Beverly's death, all funds in the account would be transferred to Fred. Beverly also executed a power of attorney form naming Fred as her attorney-in-fact. The check from the Fred Bird estate in the amount of $433,573.52 was endorsed by Beverly and deposited in the POD account.

On May 5, 2004, Fred transferred the sum of $431,406.31 from the POD account to a Charles Schwab account for the benefit of Beverly. On May 9, Beverly and Fred met

with Patrick Coyne, a financial investment adviser in Ukiah. At this meeting Beverly executed a designated beneficiary plan agreement, which opened a transfer on death (TOD) investment account in her name at "Schwab Institutional." The agreement provided that upon Beverly's death the assets in the TOD investment account would automatically transfer to Fred.

At the May 9, 2004 meeting with Patrick Coyne, Beverly also opened an investment account in the name of her revocable trust (Schwab trust account). The Schwab trust account named Beverly and Fred as cotrustees, as provided in the terms of her revocable living trust dated June 6, 2003. Beverly also designated Fred as her attorney-in-fact on these accounts and a new power of attorney was drafted to allow Fred to oversee both of the Schwab accounts. Statements of the accounts were mailed to Fred's address. He endorsed almost all checks written on the accounts. Beverly and Fred met with Coyne at least four times to discuss the status of the accounts.

On March 25, 2005, Beverly and Fred met with Vannucci to discuss amending the terms of Beverly's trust. Vannucci then learned of the TOD account and was told that Patrick Coyne was Beverly's financial advisor. Vannucci met with Beverly alone and questioned Beverly about the TOD account. Beverly confirmed to Vannucci that she understood the ramifications of the TOD account and that she wanted 100 percent of the Bird inheritance to go to Fred after her death. She explained that this was because she was very happy with Fred and all that he was doing for her. She also expressed some problems with Donald's side of the family. Vannucci found her to be her "old self" and that she was mentally competent and understood what she was doing and why.

The following day, March 26, 2005, Beverly wrote to Vannucci in longhand requesting that he prepare an amendment to her trust providing that Donald's two sons each receive $5,000 if Donald predeceased Beverly and the remainder of the special needs trust pass to Fred. Vannucci prepared a first amendment to the trust as Beverly had requested and Beverly signed the amendment on May 3, 2005.

On August 5, 2005, Donald and Beverly met with attorney Myrna Oglesby. On that date Beverly signed documents giving Oglesby permission to inquire about Beverly's financial accounts.

In October 2005, Donald and Gail were in Ukiah, leading to a series of events placing Beverly in the middle of a family dispute. On October 5, Beverly was taken by Donald and Gail to meet with Oglesby and Beverly indicated to Oglesby that she wanted to restate the terms of the June 2003 trust drawn by Vannucci. An appointment was made for Beverly to return to Oglesby's office on October 7, 2005, to sign the restated trust. When Fred learned of the meeting he took Beverly to meet with Vannucci and Beverly signed a letter to Oglesby indicating that she was represented by Vannucci and did not want to have any further contact with Oglesby. Vannucci said that at this meeting Beverly reiterated that she wanted to leave the TOD account at Schwab to Fred after her death. She also made numerous negative comments about Gail that were quoted in Vannucci's notes.

Nevertheless, on October 8, Donald and Gail took Beverly back to Oglesby's office where she executed a restated trust and pour-over will which Oglesby had drafted. The restated trust distributed the trust estate equally to Donald and Fred upon Beverly's death. It also provided that Donald and Fred would be co-trustees of her trust upon Beverly's death or if she ceased to serve as trustee. Beverly did not mention the Charles Schwab accounts or the whereabouts of the money inherited from Bird. Oglesby asked Beverly many questions to determine if she was "100 percent there that day" and concluded that Beverly understood what was happening and was competent. Each of the lawyers apparently thought they were helping Beverly resist improper pressure from the other brother.

When Fred learned that Beverly had executed a durable power of attorney naming Donald as Beverly's agent, he contacted Vannucci. Vannucci went to Brookside to meet with Beverly alone and to determine her wishes. She said she wanted Fred to be her agent and she signed a durable power of attorney and advanced health directive naming Fred as her agent.

Beverly died on December 24, 2008, at the age of 94. Shortly thereafter, the TOD account was transferred to Fred in accordance with the terms of the account.

The original complaint in this action was filed in September 2009. At that time, the parties were actively litigating, in separate probate proceedings, issues relating to the administration of the trust. Those probate proceedings led to a decision by this Court in *Bellows v. Bellows* (2011) 196 Cal.App.4th 505 holding that Fred's attorney could not condition distribution of the undisputed portion of Donald's share of Beverly's trust estate on his signing a release of claims for additional amounts. The probate case, having been remanded following appeal, is trailing this civil case.

As noted, the trial court found in favor of Fred on all causes of action. The court's statement of decision provides a detailed explanation of the court's ruling. The court found that "plaintiffs did not met their burden of proving that Fred exercised undue influence over Beverly in her decision to place the proceeds of the Fred Bird estate into a POD account which would pass to Fred on her death. Plaintiffs have presented evidence of circumstances that lead to questions about the decision to leave the money to Fred, but they have not overcome the presumption in favor of the validity of her estate plan. The circumstances are also consistent with Fred's testimony and Vannucci's testimony that this was her decision and she knew what she was doing." The court found that Beverly had testamentary capacity at all relevant times and that while Beverly may have had a "somewhat weakened mind" as a product of her age, "the plaintiffs have not shown that it resulted in undue influence in this case." The court rejected the claim for breach of fiduciary duty, explaining that "Fred had a fiduciary duty to Beverly but there is insufficient evidence to support plaintiffs' claim that Fred misled Beverly into taking any action which resulted in Fred's advantage or breach of his duty." With respect to the claim for financial elder abuse, the court explained that "there was no undue influence exercised by Fred. He did not take, secrete, appropriate, or retain property for a wrongful use or in bad faith." Having held that there was no breach of fiduciary duty as to Beverly, the court rejected the claim that Fred breached his fiduciary duty to Donald on the ground that "there can be no claim by the beneficiary through the settler." Finally, with respect to

6

the claims based on Fred's administration of Beverly's trust after her death, the court stated, "it is apparent that this case has been aggressively litigated. This is true at least as much on the part of the plaintiffs as the defendants. But the actions of the attorneys do not constitute elder abuse by Fred against Don. . . . [¶] The trust litigation was extended by Fred's attorney's insistence on the signing of a release by Donald prior to release of the funds. This misinterpretation of the law was ratified by Judge LaCasse (who was anxious to get some money paid) and required the Court of Appeal to resolve the dispute and hold that payment could not be conditioned on signing of the release or discharge. But this is not financial elder abuse by Fred and the Court of Appeal certainly did not imply that it was. The hostility between the attorneys during the litigation and through the trial should not be imputed to their clients."

Gail filed a timely notice of appeal.

## Discussion

1. *Preliminary Evidentiary Issues*

Gail agrees that the facts of this case are generally undisputed. She contends, however, the court made three erroneous prejudicial evidentiary rulings. First, Gail argues the court abused its discretion by allowing defense expert witnesses to review daily trial transcripts, including testimony by Vannucci, in violation of the trial court's *in limine* ruling excluding witnesses from the court room. At trial, a motion was made to strike any testimony by the defense experts that was given in violation of the court's order. The court denied the motion, explaining "I did make an order excluding witnesses, but by that I meant witnesses being excused from the courtroom, which is literally what the order was, and I've enforced that. . . . Normally the exclusion order involves percipient witnesses . . . so they can't tailor their testimony and make it similar or not conflict with some other witness testimony. That's really the reason normally for excluding witnesses. [¶] . . . [E]xpert witnesses are in a different position. . . . It's always been in the court's experience that, upon request, an expert would be allowed to listen to other expert's testimony." The court emphasized that its "order with regard to new opinions by experts still stands" and warned that if the court heard "any new opinions

7

expressed by experts that are different from deposition opinions, the order still stands." Consistent with this warning, the court subsequently sustained two objections to opinion testimony that had not been disclosed in the expert's deposition. We find no abuse of discretion in the court's enforcement of its in limine ruling.

Gail also argues that the court erred in allowing defendant's expert witness to testify regarding the suggested forgery of the check used to deposit Beverly's inheritance from Bird into the POD account. Defendant's expert, David Moore, testified that he analyzed the check but could not reach a conclusion about whether the signature was genuine. He testified that his "formal finding is that I have no conclusion as to whether that's a genuine signature or not." He explained, "The signature looks like a genuine signature, it appears to be her genuine signature, but, because the quality of that copy is so poor, I can't evaluate any of the subtle features in that signature." He detailed features of the check that suggested the signature was genuine.

In its statement of decision, the court explained that it found "the testimony of expert David Moore more persuasive than the testimony of expert Patricia Fisher, who thought the signature was probably not genuine. In reviewing the testimony and exhibits, the court finds David Moore's opinion that he can make no conclusion but it looks like a genuine signature is correct. The chances that Fred Bellows could have crafted such an accurate replica of Beverly's signature while at the bank seems miniscule and it is an odd item to forge since a signature would not be needed for deposit anyway."

Gail contends that Moore's testimony was admitted in violation of the court's in limine ruling excluding new opinions from experts that were not provided at their depositions. She argues, "Reviewing the signature on check number 126 was not part of Moore's initial assignment at the time of his deposition. At his deposition, Moore provided a comprehensive written list of all the opinions to which he expected to testify at trial in this case, which did not include an opinion on the genuineness of the signature on check number 126 because he had not been asked to review it."

At trial, Gail's attorney objected to Moore's testimony, noting that at his deposition "he had no conclusion whether it was a genuine signature or not, and now he's

8

adding to that." Fred's attorney disagreed, explaining that "this signature was discussed in his deposition. . . . In his analysis he said no conclusion and [he] could have been examined until the cows came home." Fred's attorney argued that " 'no conclusion' is not 'I don't have an opinion on that.' It's a scientific finding . . . meaning . . . we can't say that it's genuine, we can't say that it's not." Moore also emphasized, "In my deposition I offered a number of times to explain the reasons why I arrived at my findings, and counsel didn't take me up on that." On cross-examination, Moore acknowledged that analyzing the signature was not part of his initial assignment but that he was unaware of the dispute concerning the authenticity of the signature until he attended Fisher's deposition. The document that he provided prior to his deposition listing all opinions he would be giving at the trial included the exception, "excluding criticisms of Patricia Fisher." Thus, the fact that Moore's list did not include "an opinion on the genuineness of the signature" is not necessarily inconsistent with the court's preclusion of unlisted opinions. In all events, Moore did not in fact render an expert opinion as to the authenticity of the signature but simply explained why he assumed it to be genuine. We find no error in the court's admission of Moore's testimony on this subject.

Finally, Gail contends the court erred in preventing her attorney from cross-examining Fred and Vannucci regarding Vannucci's advice to Fred concerning the distribution of Beverly's trust. She argues that "[b]y refusing to allow plaintiffs to cross-examine Fred and Vannucci on issues they themselves raised, the trial court denied Plaintiffs their constitutional rights to a full and fair trial." She asserts that Fred waived his attorney-client privilege "by freely testifying he relied on Vannucci's advice . . . not to distribute Donald's interest in the Beverly Bellows trust," by failing to object when Vannucci testified on direct examination that Fred had never told him Fred wanted to keep the whole trust to himself, and by putting the communication at issue by asserting an "advice of counsel" defense. We disagree.

The following testimony by Fred on cross-examination did not amount to a waiver of Fred's attorney-client privilege:

9

"Q: From the time of your mother's death, until ordered to do so by Judge LaCasse in November of 2008, almost 11 months later, was there some reason you made no distribution to your brother regarding his one-half interest in the your mother's trust?

"A [Fred]: The attorneys attempted to, but you refused to cooperate. . . .

"Q: I see. I see. Did anyone advise you not to make a distribution to Mr. Donald Bellows?

"A: I followed the advice of my attorney and the courts."

Fred's testimony did not disclose a "significant part" of his consultation with Vannucci so as to result in the express waiver of his privilege. (*Southern Cal. Gas Co. v. Pub. Utilities Com.* (1990) 50 Ca1.3d 31, 46 [A "significant part" means disclosure of enough substantive information so as to reveal the specific content of the alleged confidential communication.]; *Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 602 ["mere disclosure of the fact that a communication between client and attorney had occurred does not amount to disclosure of the specific content of that communication, and as such does not necessarily constitute a waiver of the privilege"].) Moreover, as the trial court noted in overruling the objection, both parties repeatedly asserted the attorney-client privilege as an objection to questions regarding communications with their attorneys after Beverly's death. Indeed, the court expressed concern that counsel would claim Fred waived the privilege while continuing to assert that Donald's communications were privileged.

Nor did the above testimony assert an "advice of counsel" defense. (See *Mitchell v. Superior Court, supra,* 37 Cal.3d at p. 605 [recognizing that privilege may be waived in " '*one situation* in which a client has placed in issue the *decisions*, *conclusions*, *and mental state of the attorney who will be called as a witness to prove such matters*' "].) The court rejected the argument that the above testimony asserted an advice-of-counsel defense, but agreed that if Fred or Vannucci "engage in direct testimony about what one said to the other as far as the administering the trust" the court would revisit the waiver issue. Gail argues that thereafter, Fred placed into issue the decisions, conclusions and advice of his attorney and codefendant Vannucci when "Vannucci testified regarding Beverly's state of mind and intentions." But Vannucci's testimony regarding his

10

interactions with Beverly and his observations regarding her mental state and testamentary intent are distinct from any communication he may have had with Fred. Vannucci's testimony that Fred never told Vannucci that "he wanted to keep the whole Beverly Bellows Trust to himself" is only related tangentially, if at all, to communications regarding the distribution of the trust. Accordingly, we find no error in the court's rulings with respect to the attorney-client privilege.

2.      *Undue Influence*

The second cause of action for undue influence alleged that Fred exerted undue influence over Beverly, with whom he had a confidential and fiduciary relationship, to cause her to deposit her inheritance from Fred Bird into the POD and TOD accounts. In finding in favor of Fred on this claim, the court noted that "to set aside a will on the grounds of undue influence, '[e]vidence must be produced that pressure was brought to bear directly on the testamentary act . . . . Mere general influence . . . is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator.' " Relying on *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604-605, the court started with the presumption that "[i]n making an estate plan, testamentary capacity is presumed" but noted that the presumption can be overcome by evidence that undue influence was brought to bear on the testator. The court continued: "The presumption of undue influence arises only if *all* of the following elements are shown: (1) the existence of a confidential relationship between the testator and the person alleged to have exerted undue influence; (2) active participation by such person in the actual preparation or execution of the will, such conduct not being of a merely incidental nature; and (3) undue profit accruing to that person by virtue of the will. If this presumption is activated, it shifts to the proponent of the will the burden of producing proof by a preponderance of the evidence that the will was not procured by undue influence." Ultimately, the court found that "there is no showing of 'active participation' or 'undue profit' " so that "there is therefore no presumption of undue influence under the facts of this case. Even if there was, the defendants have rebutted that presumption by a preponderance of the evidence."

11

Gail does not challenge the trial court's factual findings that there was no evidence of active participation or undue profit. Rather, she argues that the court applied the wrong test for determining whether a presumption of undue influence arises. Relying on Probate Code[3] section 16004, subdivision (c),[4] she argues, "A transaction between a trustee and a beneficiary by which the trustee obtains an advantage is *presumed* to be the result of a violation of the trustee's fiduciary duties" and "[i]t is well-settled that proof of <u>any</u> transaction, not just an 'unfair' or 'undue' advantage, is presumed to be a violation of the trustee's fiduciary duties and sufficient to shift the burden of proof to the trustee."

Because this argument was not raised in the trial court, the court's statement of decision does not address the applicability of section 16004.[5] Nonetheless, the trial court specifically found that defendants had rebutted any presumption of undue influence by a preponderance of the evidence. The court relied, in particular, on Vannucci's testimony that "he discussed the POD account with [Beverly] and she confirmed her knowledge of the fact that the Fred Bird estate was in a POD account that would pass directly to Fred upon her death and that this was her wish." The court continued, "This is a fairly straightforward testamentary decision as to where the proceeds of this inheritance should go and Vannucci testified that Beverly was her 'old self' during this discussion and that she clearly wanted the Fred Bird estate to go entirely to Fred. She explained this by pointing out how good Fred had been to her as her primary caregiver since moving to Ukiah and how well he was taking care of her. . . . If a fact-finder believes Vannucci's

---

[3] All statutory references are to the Probate Code unless otherwise noted.

[4] Section 16004, subdivision (c) provides in relevant part: "A transaction between the trustee and a beneficiary which occurs during the existence of the trust or while the trustee's influence with the beneficiary remains and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof."

[5] In the trial court, Gail argued that the lesser standard of undue influence found in Civil Code section 1575, which is applicable to contracts and inter vivos transfers, not testamentary instruments, should be applied in this case. The court rejected the argument that the POD and TOD accounts were not testamentary instruments and Gail does not challenge this ruling on appeal.

testimony that he had this conversation with Beverly in March 2005 to confirm her testamentary intent, that negates any inference of undue influence. The court believed Vannucci's testimony about this meeting." Gail has not challenged that factual finding. Accordingly, even assuming section 16004 was applicable, the court's failure to recognize the rebuttable presumption was harmless because the court found any such presumption to have been rebutted.

3.      *Capacity*

The court found that at all relevant times Beverly "was competent and able to make basic testamentary decisions." Citing section 810, the court recognized that "[t]here is a rebuttable presumption that all persons have the capacity to make decisions and to be responsible for their acts and decisions."[6] The court explained further that " 'Testamentary capacity involves the question whether, at the time the will is made, the testator "has sufficient mental capacity to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument." ' " Applying this standard, the court observed, "all of those who knew and interacted with Beverly directly said she was competent and able to make decisions that affected her interests. These included the manager of Brookside, Gloria Lori, who related to her every day and described her as 'clear-minded' and 'knew exactly what was going on.' Her dentist over the years . . . , who saw her more than 20 times said she never had concerns with Beverly giving consent to treatments and they visited about personal matters. Catherine Indermill and Ryan Bellows testified as to her independent nature and how she was strong willed and would speak her mind. Fred Bellows testified to her mental alertness and the fact that she read and subscribed to the newspaper until 2006 and liked to discuss current events. Vannucci testified that in his conversations with Beverly she was clearly processing information

---

[6] Section 810, subdivision (a) provides, "For purposes of this part, there shall exist a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions."

and was thoughtful in her responses. [¶] Interestingly, Gail Bellows and Don[ald] Bellows agreed. Their testimony was that Beverly was competent and clear minded when they dealt with her and was of sound mind when she executed the restatement of trust in Oglesby's office in October 2005 and that she understood the document she was signing."

Gail contends the court wrongly placed the burden of proof on her to establish Beverly's lack of capacity and compounded this error "by evaluating Beverly's mental capacity according to the wrong legal standard." Initially, we reject Gail's argument that the court erred in applying a presumption of capacity and thereby requiring her to establish Beverly's lack of capacity. Section 810, subdivision (a) clearly establishes "a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions." Gail's argument that the presumption in section 16004—that a transaction between a trustee and a trust beneficiary is a violation of the trustee's fiduciary duties—somehow shifted the burden to Fred to establish Beverly's capacity is both illogical and without legal support. In any event, the court found that any presumption of undue influence had been rebutted.

As noted by the court, it was undisputed at trial that Beverly had basic testamentary capacity. Gail argues that evidence of basic testamentary capacity does not necessarily establish that Beverly had capacity to open the POD and TOD accounts. She asserts, "in a case such as this, where the instruments involved are complex, the test is not whether the decedent had basic testamentary capacity; the test is whether she had capacity to understand the complexity and impacts of the instruments in question."

There is, to be sure, a distinction between the basic testamentary capacity to make a will, specified in section 6100.5,[7] and the capacity to make a "testamentary transfer in

---

[7] Section 6100.5 provides in relevant part: "(a) An individual is not mentally competent to make a will if at the time of making the will either of the following is true: [¶] (1) The individual does not have sufficient mental capacity to be able to (A) understand the nature of the testamentary act, (B) understand and recollect the nature and situation of the individual's property, or (C) remember and understand the individual's relations to living descendants, spouse, and parents, and those whose interests are affected by the will."

general," that is, a transfer that will occur after death, governed by sections 810 through 812. [8] (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 730; *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352.) The standard to make a will in section 6100.5 "contemplates a significantly lower mental capacity [than for a testamentary transfer in general], requiring only that the person understand the nature of the testamentary act, the nature of the property at issue, and his or her relationship to those affected by the will." (*Lintz,* p. 1351.)[9] Testamentary transfers in general, governed by sections 810 through 812, "do not impose a single standard of contractual capacity." (*Lintz,* p. 1352.) Rather, these sections establish a "sliding scale" that requires that "capacity be evaluated in light of the complexity of the decision or act in question." (*Ibid.*) "[C]apacity to execute a trust 'must be evaluated by a person's ability to appreciate the consequences *of the particular act he or she wishes to take*.' [Citation.] Indeed, '[m]ore complicated decisions and transactions thus would appear to require greater mental function; less complicated decisions and transactions would appear to require less mental function.' " (*Ibid.*)

While the trial court here assumed that the more basic testamentary capacity standard governed the determination of Beverly's capacity to create the POD and TOD accounts, Gail did not dispute the application of this standard in the trial court . Neither *Andersen v. Hunt*, *supra,* 196 Cal.App.4th 720 nor *Lintz v. Lintz*, *supra*, 222 Cal.App.4th 1346 nor sections 811 or 812 are cited in her closing brief in the trial court. For this reason, the court's statement of decision does not expressly address the application of

---

[8] "[S]ection 811, subdivision (a) requires 'evidence of a correlation between the deficit and the decision or act in question.' [Citation.] . . . [S]ection 811, subdivision (b) provides that a deficit in mental function is relevant only to the extent 'it significantly impairs the person's ability to appreciate the consequences of his or her actions with regard to the type or act or decision in question.' [Citation.] And under . . . section 812, a person's capacity is evaluated with regard to 'the rights, duties, consequences, risks and benefits "involved in the decision." ' " (*Lintz v. Lintz*, *supra*, 222 Cal.App.4th at p. 1352, fn. 2.)

[9] "[W]hile section 6100.5 is not directly applicable to determine competency to make or amend a trust, it is made applicable through section 811 to trusts or trust amendments that are analogous to wills or codicils." (*Andersen v. Hunt, supra,* 196 Cal.App.4th at p. 731.)

sections 811 or 812. It is clear, however, that application of the "sliding scale" standard would have resulted in the same outcome in this case.

Contrary to Gail's argument, there is nothing inherently complex about the POD/TOD accounts opened by Beverly. As the trial court found, this case involved "fairly straightforward testamentary decisions." The weight of the evidence cited by the trial court established Beverley's capacity to enter those transactions. (See *Andersen v. Hunt*, *supra,* 196 Cal.App.4th at p. 731.) Thus, whether the court applied the standard found in section 6100.5, or the more fluid sliding scale standard based on the complexity of the instrument, the outcome undoubtedly would be the same, recognizing Beverley's capacity at all relevant times.

4.    *Breach of Fiduciary Duty*

The 15th cause of action alleges that Fred breached his fiduciary duties to Donald. The complaint alleges that "[f]rom June 6, 2003 through Beverly's death, Fred Bellows owed the highest fiduciary duty and highest standards of trust, loyalty and full disclosure to his brother, Donald Bellows" and that through the "funding and administration of the Beverly Bellows Trust to his favor only, Fred Bellows breached the fiduciary duty and duty of loyalty and duties of full disclosure owed to Donald Bellows."

Gail contends the "trial court erred as a matter of law when it failed to find Fred breached his fiduciary duties to Donald." She argues, "In *Bellows I*, this court found Fred violated the provisions of [section] 16004.5 when he conditioned distribution to Donald on Donald's execution of an acknowledgement of final distribution. Nevertheless, the trial court found no substantial evidence that Fred had breached his fiduciary duties to Donald, despite the presumption in [section] 16004(c) that a transaction by which a trustee obtains an advantage from a beneficiary is presumed to be a violation of the trustee's fiduciary duties. The court should have found a breach of fiduciary duty under the principles of *law of the case* and *collateral estoppel*."

Contrary to Fred's argument on appeal, the issue was raised and argued in the trial court.  Gail asserted in her written closing argument that the court's ruling in *Bellows I* required a finding in their favor on the 15th cause of action as a matter of law. The trial

16

court did not address this contention in its decision. The court found in favor of defendant, noting only that because there was no breach of fiduciary duty as to Beverly, "there can be no claim by the beneficiary through the settler." Gail is correct that this explanation does not address her claim that Fred breached his fiduciary duty owed directly to Donald. Nonetheless, while the trial court should have addressed this additional claim, under the circumstances remand is unnecessary.

In *Bellows I*, this court concluded that Fred violated section 16004.5, subdivision (a).[10] This breach, though wrongful, was not necessarily a breach of fiduciary duties. Assuming, however, that Fred's violation gave rise to a *presumption* under section 16004, subdivision (c) that Fred violated his fiduciary obligations to Donald, he was not entitled to judgment on this cause of action as a matter of law. Under section 16440, subdivision (b) the court retains discretion to excuse a trustee for liability for a breach of trust "[i]f the trustee has acted reasonably and in good faith under the circumstances as known to the trustee."[11] The trial court's statement of decision makes clear that it did not believe Fred should be held liable for the hostile conduct of the attorneys during the administration of the trust. The trial court implicitly considered Fred to have acted reasonably and in good faith in conditioning the distribution on a signed release that would have brought the litigation to an end. Moreover, this court's decision in *Bellows I,* which was fully implemented in the trial court, corrected the improper action that had been taken in demanding a release of additional claims, and the record contains no indication that any additional damages were suffered as a result of this particular breach that would entitle plaintiff to additional relief.

---

[10] Section 16004.5, subdivision (a) provides: "A trustee may not require a beneficiary to relieve the trustee of liability as a condition for making a distribution or payment to, or for the benefit of, the beneficiary, if the distribution or payment is required by the trust instrument."

[11] Section 16440, subdivision (b) provides: "If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

17

5.      *Financial Elder Abuse*

The ninth cause of action alleges that Fred committed financial elder abuse against Beverly under Welfare and Institutions Code section 15600 et seq. The complaint alleges that Fred "manipulated the elder and manipulated the finances of the elder as well as the elder's estate plan and testamentary objectives . . . by obtaining her signature or causing her to sign or 'box-check' a certain Schwab TOD account in order to circumvent the elder's formal estate plan and to deprive the elder's heirs and beneficiaries of their share of elder's trust and estate. Additionally, defendants coerced, manipulated or otherwise restricted elder in receiving, accounting for, spending or otherwise enjoying the benefits of her own inheritance from her brother Fred Bird's estate or in otherwise receiving or spending for her benefit, portions of the assets in her estate or in the Schwab TOD account."

Under Welfare and Institutions Code section 15610.30, subdivision (a)(1), " '[f]inancial abuse" of an elder . . . occurs when a person . . . [¶] [t]akes, secretes, appropriates, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." At the time of the alleged misconduct, section 15610.30, subdivision (b) provided: "A person or entity shall be deemed to have taken, secreted, appropriated, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates or retains possession of property in bad faith." (Welf. & Inst. Code, former § 15610.30, subd. (b); Stats. 2000, ch. 442, § 5.) The trial court rejected this claim, finding that Fred "did not take, secret, appropriate or retain property for a wrongful use or in bad faith."

Effective January 1, 2009, Welfare and Institutions Code section 15610.30 was amended to provide that financial abuse of an elder also occurs when a person "[t]akes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult *by undue*

18

*influence, as defined in section 1575 of the Civil Code*."[12] (Welf. & Inst. Code, former § 15610.30, subd. (a)(3), Stats. 2008, ch. 475, § 1, italics added.)[13] Gail faults the trial court for refusing to apply the definition of financial elder abuse found in subdivision (a)(3) as amended effective 2009.

In its statement of decision, the trial court explained, "The financial elder abuse statute [Welfare and Institution Code section] 15610.30 was amended effective January 1, 2009, so the former statute applies as to any claim on behalf of Beverly which predated

---

[12] Civil Code section 1575 provides that undue influences consists: "1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶] 2. In taking an unfair advantage of another's weakness of mind; or, [¶] 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress."

[13] Section 15610.30, subdivision (a)(3) was amended effective January 1, 2014, to substitute the definition of undue influence found in section 15610.70 for that found in the Civil Code. Section 15610.70 provides: "(a) "Undue influence" means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity. In determining whether a result was produced by undue influence, all of the following shall be considered: [¶] (1) The vulnerability of the victim. Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability. [¶] (2) The influencer's apparent authority. Evidence of apparent authority may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification. [¶] (3) The actions or tactics used by the influencer. Evidence of actions or tactics used may include, but is not limited to, all of the following: [¶] (A) Controlling necessaries of life, medication, the victim's interactions with others, access to information, or sleep. [¶] (B) Use of affection, intimidation, or coercion. [¶] (C) Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes. [¶] (4) The equity of the result. Evidence of the equity of the result may include, but is not limited to, the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship. [¶] (b) Evidence of an inequitable result, without more, is not sufficient to prove undue influence."

19

the change. In *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 736, the court stated that '[a]s the 2008 amendments were substantive, rather than procedural, and the Legislature did not state that the amendments were retroactive in effect, they are inapplicable.' [¶] The former statute had a 'bad faith' requirement and did not specify 'undue influence' as a specific form of elder abuse."

Gail's suggestion that the addition of subdivision (a)(3) was not a substantive change is not persuasive. The Legislative Counsel's Digest expressly states the Legislature's intent to "add to the definition of financial abuse the taking, secreting, appropriating, obtaining, or retaining, or assisting in the taking, secreting, appropriating, obtaining, or retaining, of real or personal property of an elder or dependent adult by undue influence, as defined." Her argument that the concepts of undue influence, as defined by Civil Code section 1575, "have long been applied in financial elder abuse cases" does not establish that such undue influence alone was a basis for liability under the statute as it read prior to 2009. The prior statute expressly required a wrongful use or bad faith element which the court concluded had not been proven. There was, in short, no error in the court's rejection of plaintiff's cause of action for financial elder abuse on behalf of Beverly.[14]

6.      *Probate Code sections 7000 and 7001*

At trial, a claim was asserted against Vannucci for professional negligence based on his failure to include Beverly's interest in the Bird estate in the 2003 trust. The court rejected that claim, finding that Vannucci was not negligent in failing to list on "Schedule A" of Beverly's 2003 trust instrument the Bird inheritance, which Beverly had not yet received, because the court stated, "[a]lthough Beverly had an interest in the estate, it was

---

[14] Although Gail references Donald's claim for elder abuse against Fred and argues that "[i]t cannot be disputed that the version of [section 15610.30] as amended in 2008 applied to Donald's claims against Fred for Fred's delay in distributing Donald's share of the estate," she does not appear to challenge the court's finding that Fred did not commit financial elder abuse against Donald. Because Gail has not asserted any independent grounds for reversal as to this cause of action, we need not address the matter further.

still subject to the administration of the estate and was therefore, under section 7001, an expectancy that need not be listed in the trust or on Schedule [A]."

In her opening brief, Gail acknowledges that all claims against Vannucci were settled prior to the filing of the notice of appeal. Nonetheless, she challenges the court's interpretation of sections 7000 and 7001, arguing that "[i]t was only because of the court's erroneous conclusion that the Fred Bird inheritance was never part of Beverly's trust that the court could conclude her intent was effectuated. But if the Fred Bird inheritance was in fact part of the 2003 Beverly Bellows trust (as it was under operation of law), then Beverly's expressed intent was not effectuated." Whether or not the standard of care required Vannucci to list the potential Bird inheritance in the trust documents in 2003 has little relevance, if any, to Beverly's intent in making later decisions regarding the distribution of that inheritance. The court found that in 2005, after receiving the inheritance, Beverly clearly indicated her intent that those funds be distributed entirely to Fred. As the court explained, no evidence was introduced to establish that "listing the Fred Bird inheritance on the Schedule A in 2003 would somehow have prevented Beverly from opening the POD account or that the 2003 trust would prevent the later disposition of this asset. In other words, nothing would have changed even if Vannucci had included the anticipated Bird inheritance in Schedule A." Accordingly, it is unnecessary to consider the trial court's interpretation of these probate sections as any potential error is harmless.

## Disposition

The judgment is affirmed. Fred Bellows is to recover his costs on appeal.

_____

Pollak, J.

We concur:

_____

McGuiness, P. J.

_____

Jenkins, J.