Filed 4/1/20

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION EIGHT

| | |
|---|---|
| TEANNA FORD, | B290236 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC545985) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Michele E. Flurer, Judge. Affirmed.

Balaban & Spielberger, Daniel K. Balaban; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy; Law Office of Anton R.E. Richardson and Anton R.E. Richardson for Plaintiff and Appellant.

Reily & Jeffery and Janine K. Jeffery for Defendant and Respondent.

\* \* \* \* \* \* \* \* \* \*

Plaintiff and appellant Teanna Ford was struck by a car while crossing a street on her way to school. Plaintiff sued defendant and respondent City of Los Angeles, contending the intersection in which she was hit constituted a dangerous condition of public property within the meaning of Government Code section 835. A jury returned a defense verdict, finding the property was not in a dangerous condition at the time of the incident.

Plaintiff now appeals, arguing the trial court committed evidentiary error in relying on the privilege set forth at title 23 of the United States Code section 409 (section 409) to preclude admission of a document in which defendant acknowledged the subject intersection was hazardous. Plaintiff also contends defense counsel committed numerous acts of misconduct during trial.

We conclude the trial court correctly found the document was privileged and there was no prejudicial misconduct. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 1, 2012, plaintiff, a sophomore at Crenshaw High School, was walking to school. While crossing West Slauson Avenue (a four-lane street) in a marked crosswalk, plaintiff was struck by a car. She suffered multiple injuries, including broken bones in her leg that required corrective surgeries. Plaintiff filed this action against defendant and the driver of the car that struck her. The driver was not a party to the trial below and is not a party to this appeal.

Plaintiff alleged the intersection of West Slauson and 11th Avenues in the city of Los Angeles constituted a dangerous condition of public property. Plaintiff further alleged defendant

2

had installed a traffic signal at the intersection but had failed to timely complete the installation, such that it was not operable on the day plaintiff was struck.

Plaintiff obtained discovery concerning a 2007 incident at the same intersection that involved a pedestrian fatality, as well as documents related to defendant's investigation of that incident and its subsequent application in 2008 for federal funds to improve the intersection pursuant to the Highway Safety Improvement Program (HSIP). Federal funds were provided to install the traffic signal but installation of the signal was not complete by the date of plaintiff's injuries.

Relying on the privilege codified at section 409, defendant objected to production of its application for HSIP funds. Plaintiff moved to compel. The trial court denied plaintiff's motion, finding the application was protected from discovery by section 409.

The case proceeded to a jury trial in February 2018. Defendant moved in limine to preclude admission of the application for HSIP funds at trial, again relying on section 409 as well as the pretrial discovery order. Defendant did not seek to preclude admission of any of the attachments to the application such as traffic collision reports. The court granted defendant's motion, finding defendant's application for HSIP funds was privileged under section 409 and therefore inadmissible.

Plaintiff's counsel obtained an order from the trial court finding plaintiff unavailable to testify due to mental illness and allowing excerpts from her deposition testimony and written discovery responses to be read into the record.

From the deposition excerpts, the jury learned plaintiff had walked the same route to school many times, which included

crossing the intersection at West Slauson and 11th Avenues where she was hit by the car. It was sunny and clear on the morning she was hit. Plaintiff waited at the curb for a break in traffic. She recalled looking in both directions before stepping off the curb and did not see any cars approaching. She recalled a boy on a skateboard traveling ahead of her in the crosswalk. Plaintiff was walking in the marked crosswalk and was almost to the center of Slauson when she was struck by the car. She did not see the car at any time before it hit her. She admitted having a cell phone with her but said "[i]t was put up in [her] bag" at the time.

Certain portions of plaintiff's written discovery responses were read into the record, including her admission she believed the driver of the car that hit her had been negligent in failing to yield the right of way to her.

Evidence was presented concerning the 2007 incident at the same intersection that resulted in the death of a Crenshaw High School student. Defendant presented employee witnesses who testified about the post-accident investigation of that incident, their review of traffic flows at the intersection, the initial consideration of a "smart crosswalk," and defendant's eventual decision to proceed with installation of a traffic signal. Defendant presented testimony concerning the receipt of HSIP funds in June 2008 for the installation of the signal, as well as the various procedural steps that had to be completed before the construction project could be undertaken. Construction of the signal was eventually completed in February 2013, and the signal became operational in March 2013, about five months after plaintiff was injured.

Both parties presented expert testimony regarding the design features of the intersection. Both experts described the intersection as a "mid-block" intersection, meaning an intersection between two signalized intersections. Plaintiff's expert, Edward Ruzak, stated his opinions about the aspects of the intersection that made it dangerous for pedestrians like plaintiff, including its close proximity to a signalized intersection. Defendant's expert, David Royer, stated his opinion that just because the safety of the intersection could be improved by the addition of a traffic signal did not mean the intersection was unreasonably hazardous without a signal.

The jury returned a verdict in favor of defendant, answering "No" to the first question on the special verdict form: "Was the property in a dangerous condition at the time of the incident?"

Judgment was entered in defendant's favor on March 21, 2018. Plaintiff's motion for new trial was denied.

This appeal followed.

**DISCUSSION**

**1.  The Evidentiary Ruling**

Plaintiff contends the trial court erred in precluding admission of defendant's application for HSIP funds. She maintains the application was not cloaked by the privilege set forth at section 409 and even if it was, defendant waived the benefit of the privilege by placing the application in issue as a defense. Plaintiff argues the ruling was prejudicial because it allowed defendant to conceal from the jury its admission that it believed the intersection was hazardous while simultaneously allowing defendant to argue it had acted reasonably by making efforts to improve the safety of the intersection. We disagree.

5

### a. Background

Since the late 1960's, "Congress has endeavored to improve the safety of our Nation's highways by encouraging closer federal and state cooperation with respect to road improvement projects." (*Pierce County v. Guillen* (2003) 537 U.S. 129, 133 (*Pierce*).) Various federal programs assist the States in identifying and evaluating roads and highways in need of safety improvements and provide funding for those projects. (*Ibid*.)

One of those programs, the Hazard Elimination Program (23 U.S.C. § 152)[1], requires any state that wants federal funds for safety improvement projects to "undertake a thorough evaluation of its public roads." (*Pierce, supra*, 537 U.S. at p. 133.) Shortly after the program was adopted, the States objected to the lack of confidentiality protecting the documentation of their compliance with the program. (*Ibid*.) The Secretary of Transportation reported to Congress that "the States feared that diligent efforts to identify roads eligible for aid under the [p]rogram would increase the risk of liability for accidents that took place at hazardous locations before improvements could be made." (*Id*. at p. 134.) The Secretary recommended "the adoption of legislation prohibiting the disclosure of information compiled in connection with the Hazard Elimination Program." (*Ibid*.)

In 1987, Congress responded by enacting section 409. (*Pierce, supra*, 537 U.S. at p. 134.) The statutory language was expansive in scope, precluding the admission of specified documents into evidence "in Federal or State court or considered

---

[1]  Title 23 of the United States Code section 152 was later amended and is now codified at section 148. We use section 152 to be consistent with the language in *Pierce*.

for other purposes in any action for damages." (*Ibid*.) Congress chose to protect a broad range of records and not just those records generated by States complying with the Hazard Elimination Program. Under the first prong of the statute, the privilege applies to safety improvement projects pursuant to sections 130 (Railway-Highway Crossings) and 144 (Highway Bridge Replacement and Rehabilitation Program) of title 23 of the United States Code, in addition to the Hazard Elimination Program at section 152. The second prong of the statute is more general and protects the same types of records if they were compiled or collected for "the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds." (§ 409; see also *Pierce,* at p. 134.)

In 1991, Congress amended section 409 to further broaden the scope of its protections. To clarify any ambiguity as to whether section 409 was intended to preclude disclosure in pretrial discovery, the privilege was made expressly applicable to pretrial discovery. In addition, the phrase "compiled" was changed to "compiled or collected." (*Pierce, supra*, 537 U.S. at p. 135.)

As amended, section 409 now provides: "Notwithstanding any other provision of law, *reports, surveys, schedules, lists, or data compiled or collected for the purpose* of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to [title 23 of the United States Code] sections 130, 144, and 148 . . . *or for the purpose* of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be

7

subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data." (Italics added.)

### b. Standard of review and analysis

The trial court's ruling precluding the admission of the application for HSIP funds pursuant to section 409 presents a mixed question. We generally review a trial court's ruling on the admissibility of evidence under the deferential abuse of discretion standard. (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295 [ruling on a motion in limine to exclude evidence reviewed for abuse]; see also *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.) However, our review is de novo to the extent the correctness of the court's ruling is dependent on the interpretation of the federal statute. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529.)

In her written opposition to defendant's motion in limine, plaintiff conceded that documents created, compiled or collected for purposes of participating in a federal funding program were covered by the section 409 privilege. However, plaintiff thereafter asserted during trial the same argument she raises here, that section 409 does not apply to defendant's application for federal safety funds because it is not a "report[], survey[], schedule[], list[], or data" within the meaning of section 409. She maintains that evidentiary privileges must be strictly construed and that if Congress wanted to cover applications, it could have included the word "application" in the list of documents covered by the privilege.

8

It is true that "statutes establishing evidentiary privileges must be construed narrowly." (*Pierce, supra*, 537 U.S. at p. 144.) But plaintiff's argument, that an application is not a report, survey, schedule, list, or data, is not a fair construction of section 409. Rather, it is a hyper-technical construction that is inconsistent with the clear legislative intent behind section 409 to improve the safety of our Nation's roadways by encouraging states to thoroughly investigate and candidly disclose hazardous roadways to the federal government.

*Pierce* made clear that section 409 "protects not just the information an agency generates . . . but also any information that an agency collects from other sources." (*Pierce, supra*, 537 U.S. at p. 145.) Nothing in the text of the statute, or in the construction of the statute adopted by the Supreme Court in *Pierce*, supports a conclusion that the application a State or local entity is required to submit to obtain federal funds for a road safety improvement project is not covered by the privilege because the statutory language does not contain the word "application." It would be unreasonable to construe section 409 to protect the reports, surveys and data summarized in the application but not the application itself.

Congress enacted section 409 "to quell states' fears that 'diligent efforts to identify roads eligible for aid under [federal highway safety programs] would increase the risk of liability for accidents that took place at hazardous locations before improvements could be made.'" (*Carson v. CSX Transp., Inc.* (S.C. 2012) 734 S.E.2d 148, 153 [rejecting as hyper-technical the argument that testimony about documents privileged under section 409 was not privileged because testimony is not a "report[], survey[], schedule[], list[] or data" under the statute];

9

see also *Long v. State* (La. 2005) 916 So.2d 87, 99 [section 409 was enacted to foster candor and to allow States to "compile information without hesitation and fear that information collected may be used against them in private litigation"]; *Perkins v. Ohio DOT* (Ohio Ct.App. 1989) 584 N.E.2d 794, 802 [purpose of section 409 "is to foster the free flow of safety-related information by precluding the possibility that such information later would be admissible in civil suits"].)

There is no dispute the application is a document generated by defendant to obtain federal HSIP funds for a safety improvement project. It necessarily consists of data defendant compiled for that specific purpose, as well as defendant's evaluation of that data and conclusions about the safety of the intersection. It is precisely the type of document section 409 was enacted to protect, and the trial court did not err in finding it inadmissible.

Plaintiff's reliance on *Department of Transportation v. Superior Court* (1996) 47 Cal.App.4th 852 is unavailing. The court there concluded that the Caltrans reports and records were not privileged because they were not compiled or collected pursuant to the Hazard Elimination Program. (*Id*. at pp. 856-858.) As we have explained, there is no dispute here the application was submitted to obtain federal funds for a roadway safety improvement project.[2] Nothing in *Department of*

---

[2]    In its papers before the trial court, defendant maintained the application was submitted pursuant to the Hazard Elimination Program (the first prong of the statute). On appeal, the parties appear to focus more on the second prong of the statute. Our analysis is the same whether the application for HSIP funds was submitted under the first prong or second prong of the statute.

*Transportation v. Superior Court* supports plaintiff's claim that the application here is not privileged under section 409.

Plaintiff contends it impedes the search for truth to apply the section 409 privilege to defendant's application for federal safety funding. The answer to this is that legislatures regularly preclude disclosure of information in discovery or at trial to achieve specific public policy goals. For example, Evidence Code section 1151 makes privileged remedial measures, and section 1157 makes privileged peer review records. It is not the role of courts to decide that the search for truth in civil suits is more important than the decision by Congress to make privileged an application for federal safety funds. (See Cal. Law Rev. Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 910, p. 216 ["Privileges are granted, however, for reasons of policy unrelated to the reliability of the information involved. A privilege is granted because it is considered more important to keep certain information confidential than it is to require disclosure of all the information relevant to the issues in a pending proceeding."].)

### c.    Waiver

In the alternative, plaintiff maintains that even if the application is privileged, defendant waived the privilege of section 409 by placing the application in issue as a defense. Plaintiff contends defendant put the application in issue by offering evidence that it received federal funding to improve the safety of the intersection, and compliance with federal requirements took time, such that a traffic signal had not been installed before plaintiff's injury. Courts may find an implied waiver in the interest of fundamental fairness when the party claiming a privilege has placed a communication in issue that goes to the heart of the claim in controversy. (See, e.g., *Mitchell*

11

*v. Superior Court* (1984) 37 Cal.3d 591, 604.) We recognize this general proposition, but we do not find it applies in this case.

Plaintiff also argues defendant may not use the privilege to shield evidence from coming before the jury—the statement in the application that the intersection was hazardous—while also using it as a sword—the affirmative defense that efforts were underway to improve the safety of the intersection. We also agree with the general proposition that the law does not permit a party to use a confidentiality privilege as both a shield and a sword, but we disagree that is what defendant did in this case.

Defendant did not offer any evidence about the contents of the application for federal funding. The reasons defendant gave the federal government in support of its application for funds were not implicated by defendant's assertion of the affirmative defense that it took reasonable steps to protect against the risk of injury. Defendant offered evidence it learned in June 2008 it would receive federal funding for a traffic signal at the intersection, and extensive evidence describing the different phases of the signal project requiring federal and Caltrans approval, each step of which had to be completed before the signal could be installed, so the signal could not be activated until March 2013, five months after plaintiff was injured. This evidence was relevant to prove the Government Code section 835.4, subdivision (b), affirmative defense to plaintiff's theory that defendant had notice of a dangerous condition and failed to take adequate protective measures.

The court instructed the jury with CACI No. 1112 as follows: "A public entity is not responsible for harm caused by a dangerous condition if its failure to take sufficient steps to protect against the risk of injury was reasonable. If the City of Los Angeles proves that its conduct was reasonable, then your

12

verdict must be for the City of Los Angeles.  [¶]  In determining whether the City of Los Angeles's conduct was reasonable, you must consider how much time and opportunity it had to take action.  You must also weigh the likelihood and the seriousness of the potential injury against the practicality and cost of protecting against the risk of injury."

Plaintiff does not contend the court erred by giving this instruction and we find the instruction is a correct statement of the affirmative defense.  (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1138 ["The reasonableness standard referred to in [Government Code] section 835.4 differs from the reasonableness standard that applies under sections 830 and 835 and ordinary tort principles.  Under the latter principles, the reasonableness of the defendant's conduct does not depend upon the existence of other, conflicting claims on the defendant's resources or the political barriers to acting in a reasonable manner.  But, as the California Law Revision Commission recognized, public entities may also defend against liability on the basis that, because of financial or political constraints, the public entity may not be able to accomplish what reasonably would be expected of a private entity."].)

Plaintiff cites no authority for the proposition that when a government entity asserts the Government Code section 835.4, subdivision (b), affirmative defense, that entity has impliedly waived the section 409 privilege, and we cannot think of any reason why that should be the law.

## 2.    **The Misconduct Claim**

Plaintiff next argues defense counsel committed misconduct during trial.  We are not persuaded.

### a.  Opening statement, questioning of witnesses and objections

Plaintiff contends defense counsel's misconduct was pervasive, beginning with improper argument during opening statement, disregard of court rulings, speaking objections and argumentative questions.

The alleged misconduct during opening statement consists of a few admonitions by the court to refrain from argument.  For example, at one point defense counsel told the jury that plaintiff had testified in deposition that she did not see the car.  Counsel then said, "you're going to have to figure out how you get out 30 feet into an intersection and not see . . . ."  Plaintiff objected before counsel finished the sentence.  The court told defense counsel to just outline what she believed the evidence would show without argument.  A similar admonition was given later when defense counsel discussed plaintiff's expert.

The court also sustained several of plaintiff's objections that defense counsel asked argumentative questions of plaintiff's witnesses, primarily her expert.  At various points during the trial, the court admonished defense counsel to refrain from making speaking objections.  On the other hand, the record contains several instances where plaintiff's counsel also asked argumentative questions and the court sustained defense counsel's objections.

None of these instances, whether judged individually or cumulatively, can be characterized as misconduct.  Some argumentative questions and speaking objections are routine occurrences during the course of any trial.

" 'No form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where

14

in light of the entire record, there was no actual prejudice to the appealing party.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801 (*Cassim*).) The trial court instructed the jury both at the conclusion of opening statements and during final instructions that nothing the attorneys argue or ask in a question is evidence (CACI No. 106, No. 5002). Plaintiff has not shown any prejudice arising from these acts.

### b.   Closing argument

The balance of plaintiff's misconduct claim concerns comments made by defense counsel during closing argument. "In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. ' " ' "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom." ' " ' " (*Cassim*, *supra*, 33 Cal.4th at p. 795.)

Plaintiff contends defense counsel misrepresented her discovery responses and made arguments to the jury that were not supported by any evidence. Defense counsel argued that plaintiff was "a driver's worst nightmare, because I submit, ladies and gentlemen, that the evidence is, she was on her cell phone. Counsel said there's no evidence of that. Well, let me show you what we have. We have an interrogatory that we read into evidence." Counsel then paraphrased plaintiff's response instead of reading it verbatim.

Plaintiff did not object, and instead chose to discuss the issue during the rebuttal portion of closing argument. Plaintiff's counsel argued the "cellphone issue" was "utter speculation" and reminded the jury that plaintiff had testified in her deposition that her phone had been in her backpack and that the police had

not recovered any cell phone at the scene. Because plaintiff did not object in the trial court, she has forfeited the contention on appeal that the defense argument was misconduct. (*Cassim*, *supra*, 33 Cal.4th at pp. 794-795 [in order to preserve for appeal an instance of misconduct before the jury, " 'an objection must have been lodged at trial' " and the party must " 'move for a mistrial or seek a curative admonition' "].)

Plaintiff also argues defense counsel improperly commented upon plaintiff's nonappearance at trial. Once again, plaintiff failed to object to this argument or seek a curative instruction and has therefore forfeited the contention. (*Cassim*, *supra*, 33 Cal.4th at pp. 794-795.)

Finally, plaintiff contends defense counsel tried to mislead the jury by arguing a dictionary definition of substantial factor instead of the legal definition set forth in the jury instructions. Defense counsel told the jury she wanted to explain the phrase "substantial factor" and then said "according to Merriam Webster's Dictionary," "substantial" means "important or essential." Plaintiff objected. At a sidebar conference, the court told defense counsel to make her argument without reference to a dictionary definition. When counsel resumed her argument to the jury, she said it "means a heck of a lot." Plaintiff did not raise another objection.

Following closing arguments, the court instructed the jury, including with CACI No. 430, the instruction defining substantial factor. The court also told the jury that if the attorneys said or argued anything about the law that differed from the court's instructions, the jury was required to follow the court's instructions and disregard counsel's contrary comments (CACI No. 5000).

16

The next morning, plaintiff raised the issue anew, arguing that when defense counsel resumed her argument she still did not use the legal definition of substantial factor and therefore likely confused the jury. Before the jury was sent to the jury room to begin deliberations, the court reinstructed the jury with CACI No. 430 on the legal definition of substantial factor.

There was no misconduct, and the potential jury confusion was cured by the court's thorough instructions to the jury.

## DISPOSITION

The judgment entered in favor of defendant and respondent City of Los Angeles is affirmed. City of Los Angeles shall recover its costs of appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

WILEY, J.